**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mission Wellness Pharmacy LLC,<br><br>Petitioner,<br><br>v.<br><br>Caremark LLC, et al.,<br><br>Respondents. | No. CV-22-00967-PHX-GMS<br><br>**ORDER** |

Pending before the Court are Respondent Caremark's Motions to Seal (Doc. 24) (Doc. 37). For the following reasons, the first Motion to Seal (Doc. 24) is granted in part and denied in part, and the second Motion to Seal (Doc. 37) is granted.

**BACKGROUND**

These Motions to Seal stem from a complex commercial arbitration that invalidated a fee agreement between Mission Wellness (a specialty pharmacy) and Caremark (a Pharmacy Benefit Manager or "PBM"). In that arbitration, Mission Wellness (hereinafter, "Mission") claimed that Caremark assessed excessive "direct and indirect remuneration fees" ("DIR fees") in violation of federal statutes and Arizona state law. For its part, Caremark claimed it was merely enforcing the terms of the parties' fee agreement. Ultimately, the Arbitrator ruled in Mission's favor, and on May 17, 2022, he ordered Caremark to pay $3,662,099.47. However, to date, Caremark has neither paid the award nor provided Mission with assurances that it will eventually pay. On June 20, 2022,

Mission asked the Court to confirm the award. On July 29, 2022, Caremark asked the Court to vacate it.

Caremark also filed two Motions to Seal. In its first Motion to Seal (Doc. 24), Caremark seeks to file redacted versions of its Cross-Motion to Vacate (Doc. 23) and three Network Enrollment Forms ("NEFs") from 2015 (Doc. 23-5), 2016 (Doc. 23-6), and 2020 (Doc. 23-4), respectively. These documents contain redacted references to numerical data Caremark uses in its agreements with pharmacies, including:

- average-wholesale-price discounts for generic and brand-name drugs ("AWP Discounts");
- dispensing fees;
- variable network rebate rates and ranges, also known as "Performance Network Rebate" ("PNR") fees;
- weighted factors used to calculate PNRs;
- fixed network-rebate rates and ranges;
- point-of-sale reimbursement rates (AWP minus X%), and;
- the names of various specialty drugs, whether the drugs were excluded from a PNR, and the drugs' associated AWP discounts, which are listed in a Specialty Drug Reimbursement Addendum ("SDRA").

Some of Caremark's filings discuss the redacted data in general terms. For example, in its Cross-Motion to Vacate, Caremark references the range in which all PNR fees fall without referencing any particular pharmacy's PNR fees. (Doc. 23 at 4.) Other filings reference data that is specific to particular pharmacy networks, like Exhibit 5, which lists Network 23's dispensing fee circa 2015. (Doc. 23-5 at 2.) And some filings reference data that is specific to the agreement at issue in the arbitration, such as Mission's AWP discount rate for generic drugs. (Doc. 23-4 at 3.)

In its second Motion to Seal (Doc. 37), Caremark seeks to file redacted versions of the Reply (Doc. 36) that corresponds with its Cross-Motion to Vacate, two deposition transcripts (Doc. 36-1), (Doc. 36-2), a post-hearing brief from arbitration (Doc. 36-4), and their response to that brief (Doc. 36-5). These documents contain references to the same kind of data (and, in many cases, the same data) as the documents connected to Caremark's

first Motion to Seal, except the second Motion to Seal does not include redacted references to fixed-rate rebates, dispensing fees, or the SDRA data. Because the data underpinning both motions is highly similar this order will address whether categories of data (e.g., AWP discounts, fixed network-rebate fees, etc.) should be sealed, rather than analyze each motion or source independently.

## DISCUSSION

### I.     Legal Standard

Courts review all motions to seal with a "strong presumption in favor of [public] access." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). However, sources of business information should be sealed when its' publication would harm a party's competitive standing. Fed. R. Civ. P. 26(c)(1)(G); *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016). But parties' mere allegations that disclosure would harm their competitive standing are insufficient to justify sealing court records. *Kamakana*, 447 F.3d at 1179). Instead, movants must offer "compelling evidence" that shows disclosure would harm their competitive standing, for example, by alleging that the underlying documents contain trade secrets. *Nixon v. Warner Comms., Inc.*, 435 U.S. 589, 598 (1978); *see also TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*, 2011 WL 4947343, at *2 (D. Ariz. Oct. 18, 2011). Because public disclosure of trade secrets necessarily harms a party's competitive standing, "a court may expose trade secrets only in extraordinary circumstances." *Ctr. for Auto Safety v. Goodyear Tire & Rubber Co.*, 247 Ariz. 567, 573 (Ct. App. 2019).

### II.    Analysis

In Arizona, the existence of a trade secret "is a mixed question of law and fact" that requires a movant to prove that the (1) underlying information is not generally known or ascertainable and (2) retains economic value because it is unknown to others, and (3) the owner has taken steps to maintain its secrecy. *Physics, Materials, & Applied Mathematics Research LLC v. Yeak*, Case No., 2021 WL 2557398, at *5 (Date D. Ariz. 2021) (citing *Calisi v. Unified Financial Services, LLC*, 302 P.3d 628 (Ariz. Ct. App. 2013)). The

definition of "trade secret" is expansive under Arizona law. *Phoenix v. Ehmke*, 197 Ariz. 144, 149 (Ct. App. 1999). Still, the owner of a trade secret must identify the secret with sufficient particularity, especially where the matter is highly complex. *Goodyear*, 247 Ariz. at 570; *see also InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (citing *Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998)).

Caremark has identified the alleged trade secrets with sufficient particularity. It has redacted specific figures, but otherwise provides documents in their original, unredacted form. Additionally, Caremark has identified methods by which it sought to keep the redacted data secret—the data is pulled from documents that contain confidentiality disclaimers. *Enter. Leasing Co. of Phoenix v. Ehmke*, 3 P.3d 1064, 1070 (Ariz. Ct. App. 1999) ("[T]he most important factor in gaining trade-secret protection is demonstrating that the owner has taken such precautions as are reasonable under the circumstances to preserve the secrecy of the information."). Still, not all of the data Caremark seeks to seal appears to retain economic value by virtue of being unknown. Likewise, some of the data has been publicly disclosed.

### A. Economic Value by Virtue of Being Unknown

Generally speaking, the network-specific data Caremark seeks to seal is economically valuable when it is unknown to others. The fundamental purpose of a PBM is to bargain with actors in the healthcare supply chain to drive down drug prices. The specific methods and means by which PBMs achieve this end are important commercial assets. Thus, Caremark uses confidentiality disclaimers on documents containing AWP discounts, dispensing fees, specialty drug names, variable-rate fees, performance criteria, and other information related to reimbursement rates. If Caremark's competitors could access rates and discounts Caremark offers to pharmacies that participate in its networks, they certainly might find this data economically valuable—other PBMs could offer better PNR fees. Any redacted data that specifically references products, PNR fees, and discounts that Caremark has offered particular pharmacies, including Mission, is economically

valuable insofar as it is unknown. *See, e.g., Calisi v. Unified Fin. Servs., LLC*, 232 Ariz. 103, 106 (Ct. App. 2013) (noting that information "may be entitled to trade secret protection when it represents a selective accumulation of detailed, valuable information."); *Enter. Leasing Co.*, 197 Ariz. at 149 (finding that the subject matter of a trade secret "must be of such a nature that it would not occur to persons in the trade or business.").

Caremark has also introduced compelling evidence that disclosure of non-specific data[1] would provide Caremark's competitors with an economic advantage. For example, in support of its Motions, Caremark submitted statements from its Vice President of Network Services, Steven McCall, and an Assistant Vice President of Specialty, Commercial, and Medicaid Network Development, Michael Murphy. These statements suggest that the redacted data, including non-specific data, would give Caremark's competitors a roadmap for creating competing fee structures and methodologies that they otherwise could not develop without significant research and investment. (Doc. 24-1 at 1-4); (Doc. 24-2 at 1–4.). This point is persuasive with respect to Caremark's use of non-specific point-of-sale reimbursement rates and PNR fee ranges in its Cross-Motion to Vacate. (Doc. 23 at 4.) While these ranges are "not applicable to any current business arrangement between [Caremark] and any other entity," they do reflect the actual ranges in which all providers' PNR fees fall and are expressly used to illustrate the methodology Caremark uses to calculate PNR fees. (Doc. 31 at 2.) Likewise, the reimbursement rates closely mirror the rates Caremark uses in its agreements with pharmacies. Thus, point-of-sale reimbursement rates and PNR fee ranges are properly viewed as a "formula, pattern, [or] compilation" that reflect Caremark's proprietary business practices, which its competitors could leverage to create or improve their own drug pricing programs. *Enter. Leasing Co.*, 197 Ariz. at 148. As a result, Caremark has shown that even general

---

[1] Here, non-specific data refers to figures that Caremark uses to describe how it calculates DIR fees in a general sense. In its filings, Caremark sometimes illustrates its methodologies by using stand-in values for things like AWP discounts and PNR fee ranges, instead of referencing the AWP discounts and PNR fee range it offers to specific networks. Although this description does not reflect any of the agreements between Caremark and its contracted networks, to reveal actual figure would still reveal a good deal about its business practices.

references the company uses to illustrate its fee structures might retain economic value because they are unknown.

Still, Caremark has not presented evidence that shows its fixed network-rebate fees are economically valuable because they are unknown. Caremark stopped using fixed network-rebate fees in 2015. (Doc. 2 at 8.) Thus, it is not entirely clear what competitive advantage Caremark's competitors might gain from learning about a fee structure that is completely obsolete. Thus, neither specific nor general references to the fixed network-rebate fee should be sealed.

Despite Mission's argument that Caremark's Motions involve outdated data, the Court will not extend this reasoning to the rest of the data Caremark seeks to file under seal—even other data from 2015. Generally speaking, "the age of [] documents" diminishes but does "not entirely eliminate[] the need to keep them confidential." *Gann v. Gen. Motors LLC*, No. CV2200080TUCRMEJM, 2022 WL 3552484, at *4 (D. Ariz. Aug. 18, 2022) (quoting *Brittain v. Stroh Brewery Co.*, 136 F.R.D. 408, 416 (M.D.N.C. 1991)). Here, the issue is not the age of the underlying data, but rather the fact that Caremark no longer uses fixed network-rebate fees to calculate DIRs. Exhibit 5 (an NEF from 2015) neatly illustrates the practical implications of this distinction. While Exhibit 5 contains a reference to the old, fixed network-rebate fee (which should not be redacted), it also includes AWP discounts and dispensing fees, which are mechanisms that Caremark currently uses in its NEF agreements with pharmacies (which should remain redacted). Because Caremark's competitors might use the old AWP discounts and dispensing fees to glean something about Caremark's current practices, they retain economic value when they are unknown. For example, if a competitor could see the AWP discounts listed in the NEFs from 2015, 2016, and 2020, it might be able to project the AWP discount for 2022. Conversely, Caremark's competitors cannot discern anything about Caremark's current practices by looking at the fixed network-rebate fee. Thus, references to the fixed network-rebate fee provide Caremark's competitors with a far less significant competitive advantage, if they provide any advantage at all. Accordingly, the Court finds that all of the

data Caremark seeks to seal derives economic value from being unknown, except its fixed network-rebate fee.

### B. Publicly Known

Business information that would typically be considered a "trade secret" loses its protected status if it has been publicly disclosed (or is generally known) by proper means. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984); A.R.S. § 44-401(4)(a). Mission points to three sources to show that the redacted data has been publicly disclosed, including (1) an excerpt from *AIDS Healthcare Foundation v. CVS Caremark*, No. 2:21-cv-01913, ECF No. 58-1, at 12; (2) a document published on the American Pharmacy Cooperative's ("ACPI") website, and (3) Caremark's practice of sending NEFs to pharmacies that do not enroll in their networks. Mission's first source suggests that some of Caremark's non-specific data has been publicly disclosed. Nevertheless, there are compelling reasons to seal these references. Mission's other sources are not persuasive for the reasons outlined below.

#### i. *AIDS Healthcare Foundation*

First, Mission cites an excerpt from *AIDS Healthcare Foundation* that uses non-specific examples of point-of-sale rates, fixed network-rebate fees, and PNR fees to illustrate the change in Caremark's fee-calculation methodology as it shifted from a fixed network-rebate fee system to a performance-based system. As mentioned above, Caremark has not shown that fixed network-rebate fees are a trade secret or otherwise harm its competitive standing. Thus, the following discussion only addresses the excerpt's effect on the point-of-sale rates and PNR fees.

To start, the excerpt does not reference specific point-of-sale rates or PNR fees tied to particular networks or agreements. It, therefore, does not suggest that the point-of-sale rates or PNR fees listed in (or appended to) the NEFs and referenced in Caremark's other filings, including its Reply and deposition transcripts that feature questions about Mission's PNR fees, have been publicly disclosed. However, the quoted excerpt is highly similar to Caremark's invocation of hypothetical point-of-sale reimbursement rates and PNR fee

ranges in its Cross-Motion to Vacate. This data is almost certainly publicly disclosed in a general sense.[2] As a result, the Court declines to seal Caremark's general references to point-of-sale rates and PNR fees as trade secrets.

Nevertheless, the more widely these figures are circulated, the more likely it becomes that Caremark's competitors will access or use them in a way that harms Caremark's competitive standing. This is especially true because the point-of-sale rates and PNR fees in Caremark's Cross-Motion to Vacate, while similar, are not identical to the figures cited in *AIDS Healthcare Foundation*. Absent a seal, Caremark's competitors could compare the figures in both cases and discern more information about the company's current business practices than they can by looking at the *AIDS Healthcare Foundation* excerpt alone. This is a compelling reason to seal these figures, even if the Court cannot say that general references to point-of-sale rates and PNR fees are trade secrets.

### ii. ACPI Document

Second, Mission points to a PDF document on a third-party website, which lays out the performance criteria Caremark used to calculate its 2016 PNR fees. However, this does not tend to show that the criteria are generally known. The relative weights given to the performance criteria in that PDF are not reflected across the exhibits Caremark has requested to seal—NEFs from different years have different values assigned to the same metrics. But, even if there is overlap between some of the NEFs and the metrics Caremark seeks to seal, the public document is hosted by a third-party website and contains a disclaimer that shows it was not intended for public disclosure.

Trade secrets only lose their protected status when they are generally known or ascertainable by *proper* means. A.R.S. § 44-401(4)(a). Here, Caremark claims ACPI's disclosure is improper—an assertion that is bolstered by the confidentiality disclaimer at

---

[2] The weight of authority, including authority in states with similar trade secret statutes, suggests that information does not lose its protected trade-secret status simply because it is listed in court documents. *See Hoeschst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 418 (4th Cir. 1999); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 848–49 (10th Cir. 1993); *Kittrich Corp. v. Chilewich Sultan LLC*, No. CV 12-10079, 2013 WL 12131376, at *4 (C.D. Cal. Feb. 20, 2013); *MicroStrategy Inc. v. Business Objects*, S.A., 331 F. Supp. 2d 396, 418 (E.D. Va. 2004); *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1254–55 (N.D. Cal. 1995).

the bottom of the document. *InteliClear*, 978 F.3d at 660–61 (citing *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993)) ("Confidentiality provisions constitute reasonable steps to maintain secrecy."). Indeed, in a recent case, a court found that this exact PDF did not amount to public disclosure and allowed Caremark[3] to file redacted versions of the same performance criteria. *Senderra Rx Partners, LLC*, No. 2:19-CV–05816–SPL (D. Ariz.), ECF No. 87, at 5 (citing the same document and concluding that "publication in [a] Third-Party PDF alone likely does not destroy trade secret protection."). Accordingly, the performance criteria are trade secrets and should be filed in their redacted form.

### iii.  Distribution to Other Pharmacies

Finally, it is immaterial that Caremark sometimes shares NEFs with pharmacies that do not enroll in its networks. If independent companies have access to information, "trade secret status is not necessarily lost[] [a]s long as the two entities each keep the information secret from the rest of the world, trade secret protection is preserved." § 18:6. Elements of a trade secret—Not generally known or readily ascertainable, 9 Ariz. Prac., Bus. Law Deskbook § 18:6 (2021–2022 ed.) (citing Restatement Third, Unfair Competition, § 39(f)). Here, pharmacies are "contractually required to maintain the confidentiality" of the information contained in the NEFs. (Doc 24-1 at 9.) And, even if the NEFs are broadly available to Caremark's potential customers, there is no evidence that Caremark's NEFs are also available to other PBMs. As a result, Caremark's practice of distributing NEFs to pharmacies does not indicate that their content is publicly known.

### CONCLUSION

For all of the reasons above, the documents associated with Caremark's Motions to Seal should be filed under seal, except for documents containing references to fixed network-rebate fees, whether general or specific to particular pharmacies. As far as the Court can tell, the only documents that mention the fixed network-rebate fees are Caremark's Cross-Motion to Vacate and the NEF from 2015.

---

[3] Caremark is a subsidiary of CVS Healthcare. The Court uses "Caremark" for convenience.

Accordingly,

**IT IS HEREBY ORDERED** that Caremark's Motion to Seal (Doc. 37) is **GRANTED.**

**IT IS FURTHER ORDERED** directing the Clerk of the Court to file the documents lodged at Doc. 40 under seal.

**IT IS FURTHER ORDERED** that Caremark's Motion to Seal (Doc. 24) is **GRANTED in part** and **DENIED in part**.

**IT IS FURTHER ORDERED** that Caremark should file updated versions of its Cross-Motion to Vacate (Doc. 23), the NEF from 2015 (Doc. 23-5)—and any other documents that contain redacted references to fixed network-rebate fees—on the public docket no later than **November 29, 2022**.

**IT IS FURTHER ORDERED** that the Clerk of the Court take no action with respect to the documents lodged under seal at Doc. 27. Once Caremark files properly redacted versions of the relevant documents, the Court will direct the Clerk of Court to file the documents lodged at Doc. 27 under seal.

Dated this 17th day of November, 2022.

_G. Murray Snow_
G. Murray Snow
Chief United States District Judge