# EXHIBIT A

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Tribunal

| | | |
|---|---|---|
| AIDS HEALTHCARE FOUNDATION, | ) | |
| | ) | |
| Claimant, | ) | AAA Case No. 01-19-0004-0127 |
| | ) | |
| v. | ) | |
| | ) | |
| CVS CAREMARK, a subsidiary of CVS HEALTH CORPORATION, | ) | **FINAL AWARD** |
| | ) | |
| Respondents. | ) | |
| | ) | |

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated February 1, 2007, and having been duly sworn, having duly heard the proofs and allegations of the Parties, and having issued an Interim Award dated August 3, 2021 do hereby issue this FINAL AWARD as follows:

This matter came on for hearing before William "Zak" Taylor, arbitrator with testimony beginning April 12, 2021 and ending on April 23, 2021. Appearing for Claimants were Andrew F. Kim and Rebecca J. Riley of Kim Riley Law and Tom Myers of Aids Healthcare Foundation. Appearing for Respondents were Kevin P. Shea, Jonathan M. Lively, Elizabeth Z. Meraz and Aon S. Hussain of Nixon Peabody, LLP. The quality of the lawyering on both sides was high. The hearing was transcribed by a court reporter.

Nine witnesses testified at the hearing and over 690 exhibits were entered into evidence. The hearing lasted five days. After the testimony phase, the parties engaged in two rounds of simultaneous briefing. After a thorough review of the transcript, the testimony, the exhibits and

1

the briefing, the Arbitrator makes the following determinations of fact, mixed fact and law; and issues this Interim Final Award.

## BACKGROUND

This is a breach of contract action whereby Claimant seeks recovery of damages, a declaration of non-enforcement and prohibition of the application of Respondents' Provider Network Performance program (hereinafter "PNP") going forward, and attorneys' fees and costs with respect to this proceeding. Respondent seeks denial of Claimant's claims and recovery of attorney's fees and costs. Per the contract at issue, Arizona law provides the substantive law for the claims made.

## ISSUES TO BE DETERMINED

The issues to be determined are as follows:

1. Did Respondent breach the contract with its application of the PNP resulting in Aids Healthcare Foundation (hereinafter "AHF") being paid less than the contract required?

2. Did Respondent breach the contract by violating the covenant of good faith and fair dealing by implementing the PNP?

3. Was the imposition of the PNP procedurally unconscionable?

4. Are the terms of the PNP substantively unconscionable?

5. Is the PNP an unenforceable contract of adhesion?

6. Should the PNP be enjoined going forward?

7. What, if any, damages has AHF sustained?

8. Who, Claimant or Respondent, is the prevailing party? (The attorneys' fees and costs portion of this proceeding is deferred to determination through a subsequent process.)

## STIPULATED FACTS

2

The parties entered into an extensive stipulation of facts as follows:

## I.   **The Parties**

### a.   *AIDS Healthcare Foundation*

1.      Established in 1987, AHF is a California not-for-profit, tax exempt, 501(c)(3) corporation.

2.      AHF owns and operates retail pharmacies that serve HIV/AIDS patients, including patients enrolled in the Medicare Part D prescription drug program.

3.      Each AHF-affiliated pharmacy has a unique national identification number, as assigned by the National Council for Prescription Drug Programs ("NCPDP"). Each individual AHF-affiliated pharmacy uses its own unique NCPDP number when submitting claims to Caremark for reimbursement.

4.      Exhibit A attached hereto identifies the AHF-affiliated pharmacies.

### b.   *Caremark*

5.      CVS Caremark is not a legal entity but rather, a trade name.

6.      Caremark, L.L.C. and CaremarkPCS, L.L.C. (collectively, "Caremark") contract with prescription drug plan sponsors to provide pharmacy benefit management services to the plan's members. In turn, Caremark separately contracts with pharmacies across the country for the ability to provide pharmacy services to those members.

7.      Caremark is a pharmacy benefit manager ("PBM"). In this role, Caremark manages the prescription drug benefits of its clients, which generally consist of insurers, third party administrators, business coalitions, employer sponsors of group health plans, and relevant to these proceedings, government prescription drug plan sponsors.

8.      Caremark offers many services to its clients, including the administration and maintenance of nation-wide pharmacy networks (collectively, the "Networks") to provide pharmacy access to its clients' members. These Networks differ based on a variety of factors, including the type of prescription benefit plan being administered by Caremark. For example, commercial plan networks, not relevant to this matter, differ from government-sponsored plan networks (*i.e.*, Medicare). Caremark has over 68,000 pharmacies enrolled in its various networks, including AHF-affiliated pharmacies.

## II. **The Parties' Relationship**

### a. *General Background*

9.      Pursuant to the various contract documents, pharmacies, generally referred to as "Providers," agree to provide pharmacy services in accordance with the terms of those agreements.

10.      When a customer fills a prescription at a Caremark network pharmacy (e.g., an AHF-affiliated pharmacy), the pharmacy submits a reimbursement claim to the customer's prescriptions insurance plan via Caremark, and Caremark adjudicates that claim electronically on behalf of its client – the plan sponsor.

11.      This adjudication process, among other things, confirms that the prescribed product is covered by the customer's health plan, and advises the pharmacy the reimbursement rate at the point of service for the drug along with the amount of co-pay that the pharmacy should collect from the customer based on its plan coverage.

### b. *The Provider Agreements and Agency Addenda*

---

[1] In some cases, the applicable provider agreement was executed by a pharmacy and an entity acquired or otherwise

12.     Beginning in 2007 and prior to November of 2019, each AHF-affiliated pharmacy independently entered into a separate contract with Caremark[1] to participate in Caremark's Networks, titled a "Provider Agreement."

13.     During that time period, AHF-affiliated pharmacies utilized a pharmacy services administrative organization ("PSAO") called Leader Drug Stores, Inc. ("LeaderNet").

14.     AHF-affiliated pharmacies submitted, through LeaderNet, applications and other documentation demonstrating each pharmacy's ownership, credentialing, and proper licensing.

15.     Caremark approved AHF-affiliated pharmacies to participate in the Networks as "Providers" after they executed a Provider Agreement with Caremark.

16.     LeaderNet, among other things, managed payments between Caremark and LeaderNet's affiliated pharmacies.

17.     Sometime prior to November 4, 2019, the AHF-affiliated pharmacies terminated their relationships with LeaderNet and began contracting directly with Caremark on their own behalf.

18.     On or about November 4, 2019, the AHF pharmacies became a pharmacy chain in Caremark's Networks, and Caremark and AHF executed four provider chain agreements (the "Chain Provider Agreements"). Exhibit J-4 (Caremark000909-22); Exhibit J-5 (Caremark000923-34); Exhibit J-6 (Caremark000935-38); Exhibit J-7 (Caremark000939-50).

19.     The contract documents between AHF and Caremark include the following documents:

        a.      The Provider Agreements (prior to November 4, 2019);

        b.      The Chain Provider Agreements (after November 4, 2019);

---

merged with what is now Caremark.

5

    c.     The CVS Caremark Provider Manuals and any amendments to them in effect during the contracting periods;

    d.     The Caremark Documents, defined in the Provider Manuals as: "[T]he Provider Agreement, schedules thereto, addenda, the Provider Manual and all attachments thereto including [the] Glossary of Terms, Federal Laws and Regulations, State Laws and Regulations, information transmitted by Caremark to Provider through the claims adjudication system, and information transmitted by Caremark to Provider specifically designated by Caremark as a 'Caremark Document' which may include educational materials related to products, programs, services, and Plan Sponsor announcements[;]" and

    e.     Caremark Network Enrollment Forms ("NEFs").

20.    The Chain Provider Agreements provide, among other things, as follows:

> Provider agrees that it will participate in all Caremark and Plan Sponsor pharmacy networks in which: (1) Provider participates in as of the date of this Agreement; (2) Provider and Caremark have executed a network addendum or network enrollment form as of the date of this agreement (3) provider and Caremark subsequently execute a network addendum or network enrollment form; and (4) Provider agrees to participate as evidenced by its provision of the Pharmacy services to an Eligible Person of a Plan Sponsor utilizing such pharmacy network(s). *See e.g.,* Exhibit J-6

21.    The Provider Manuals also provide, among other things, as follows:

> Provider must support all Caremark performance initiatives, such as but not limited to, performance network programs (which may include adherence and drug therapy gap alerts)...." *See e.g.,* Exhibit J-13.

22.    The Provider Manuals also provide, among other things, as follows: "Provider must support all clinical programs and services...." *See e.g.,* Exhibit J-13.

23.     The 2018 Provider Manual also provides, among other things, as follows:

> From time to time, and notwithstanding any other provision in the Provider Agreement (which includes the Provider Manual), Caremark may amend the Provider Agreement, including the Provider Manual or other Caremark Documents, by giving notice to Provider of the terms of the amendment and specifying the date the amendment becomes effective. If Provider submits claims to Caremark after the effective date of any notice or amendment, the terms of the notice or amendment is accepted by Provider and is considered part of the Provider Agreement.

Exhibit J-13.

24.     The 2018 Provider Manual and the 2018 Provider Manual Amendments provide, among other things, as follows:

> In the event Provider breaches the Provider Agreement, which includes the Provider Manual, addenda and other Caremark Documents, Caremark may terminate the Provider Agreement (or Provider's participation in specific Plans or networks) and may exercise other remedies available to Caremark as may be set forth herein or otherwise available at Law or equity.

Exhibit J-13; Exhibit J-14.

25.     The Provider Agreements provide, among other things, as follows:

> Unless otherwise set forth in a network addendum or network enrollment form signed by both parties, claims submitted for a Plan Sponsor participating in an Caremark or Plan Sponsor network will be reimbursed at the lower of: (i) AWP less the applicable AWP Discount plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) gross amount due less the applicable Patient Pay Amount. The applicable AWP Discount and Dispensing Fee will be set forth in the applicable network addendum or network enrollment form. If Provider has not executed and delivered to Caremark a network addendum or network enrollment form, the applicable AWP Discount and Dispensing Fee will be the reimbursement rate as indicated in the adjudication claims system as to such claim. AWP

7

Discounts and Dispensing Fees may be amended in accordance with the terms of the Agreement.

Notwithstanding any other provision in the Provider Agreement, claims (excluding compounded medications) submitted for a Plan Sponsor participating in a Caremark or Plan Sponsor network may be reimbursed at the lower of: (i) Price Type plus an applicable percentage of the Price Type, or minus the applicable percentage of the Price Type, plus the applicable Dispensing Fee less the applicable Patient Pay Amount (or if applicable Price Type is unavailable for a given drug, Caremark will pay Provider based upon AWP minus the applicable AWP Discount plus the applicable Dispensing Fee minus the applicable Patient Pay Amount); (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) Provider's submitted Gross Amount Due less the applicable Patient Pay Amount.

*See e.g.,* Exhibit J-6.

## III. The Networks and Network Enrollment Forms

26.    At all relevant times, Caremark operated various Medicare Part D pharmacy networks on behalf of its Medicare Part D plan sponsor clients.

27.    AHF enrolled in, and submitted claims for reimbursement through, the following Medicare Part D Networks:

a.    ***Retail Network 22:*** AHF-affiliated pharmacies enrolled in Network 22. Exhibit J-596 (Caremark009193-94). The NEF provides, among other things, "Provider is hereby enrolled as a provider in the Caremark Medicare Part D Retail Network identified below, effective January 1, 2015, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 22 | 15.50% | 25.0% | $1.00 |
| *1-90 Days Supply | | | |

8

*Id.* The NEF further provides, among other things:

- Provider will be charged a network rebate to the Plan Sponsor equal to 1 75% of the ingredient cost paid excluding claims paid at Usual and Customary

    *Id.*

    b. **Retail Network 23**: AHF-affiliated pharmacies enrolled in Network 23. Exhibit J-626 (Caremark004268). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Caremark Medicare Part D Retail Network 23 effective January 1, 2015, as indicated in the table below, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brands | Generic | |
| Medicare Part D Retail Network 23 | 16.25% | 25.0% | $0.50 |
| *1 90 Days Supply | | | |

    *Id.* The NEF further provides, among other things, that:

- Provider will be charged a network rebate to the Plan Sponsor equal to 3.00% of the ingredient cost paid, excluding claims paid at Usual and Customary.

    *Id.*

    c. **Retail Network 32:** AHF-affiliated pharmacies enrolled in Network 32. Exhibit J-619 (Caremark004379). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Network(s) indicated below" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, of the Caremark Provider Agreement, Provider agrees to the following reimbursement, and other unique requirements, if any, as indicated below:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| | AWP Discount | | Disp Fee | AWP Discount | | Disp Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Preferred Retail Network 32 Effective 1/1/2014 | 15.25% | 25.0% | $1.00 | 18.0% | 25.0% | $0.00 |
| *EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply) | | | | | | |

    *Id.* The NEF further provides, among other things, that:

9

- Provider will be charged a network rebate to the Plan Sponsor in an amount equal to 5.25% of the ingredient cost for each Non-Extended Days Supply drug claim paid and in an amount equal to 4.00% of the ingredient cost for each Extended Days Supply drug claim paid, excluding claims paid at Usual and Customary.

   *Id.*

d. ***Retail Network 34:*** AHF-affiliated pharmacies enrolled in Network 34 Preferred. Exhibit J-627 (Caremark004270). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Caremark Medicare Part D Retail Network 34 effective January 1, 2015, as indicated in the table below, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 34 | 16.75% | 25.0% | $0.75 |
| *1-90 Days Supply | | | |

   *Id.* The NEF further provides, among other things, that:

- Provider will be charged a network rebate to the Plan Sponsor equal to 2.75% of the ingredient cost paid for brands and 9.5% of the ingredient cost paid for generics, excluding claims paid at Usual and Customary.

   *Id.*

e. ***Retail Network Form 35:*** AHF-affiliated pharmacies enrolled in Network 35 Preferred. Exhibit J-628 (Caremark004271-72). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Caremark Medicare Part D Retail and Extended Days' Supply (EDS) Network 35 effective January 1, 2015, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"



| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS) | | |
|---|---|---|---|---|---|---|
| | AWP Discount | | Disp. Fee | AWP Discount | | Disp Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail and EDS Network 35 | 16.75% | 25.0% | $1.00 | 21.50% | 25.0% | $0.00 |
| *EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply) | | | | | | |

   *Id.* The NEF further provides, among other things, that:

- Provider will be charged a network rebate to the Plan Sponsor equal to 3.00% of the ingredient cost paid for non-extended days supply and 2.00% for extended days supply, excluding claims paid at Usual and Customary.

*Id.*

## IV. The Program and Network Enrollment Forms

28.     Beginning on January 1, 2016, select Caremark Medicare Part D pharmacy networks became part of Caremark's Performance Network Program ("PNP").

29.     As relevant to this matter, starting in 2015 and prior to January 1, 2016, Caremark reimbursed pharmacies with a point-of-sale rate (e.g., AWP[2] – 16%) coupled with a set network fee (e.g., 3%), which was assessed at the point of sale. Starting on January 1, 2016, instead of assessing a flat network fee, pharmacies were assessed a variable network fee range (e.g., 3-5%) depending on performance in the performance metrics, with the higher performing pharmacies paying the lower fee and vice-versa. Caremark assesses these performance fees after the point of sale on a trimester basis.

30.     Thus, for each reimbursement claim submitted by a pharmacy after January 1, 2016, Caremark reimburses the pharmacy at the AWP rate indicated on the NEF at the point of sale. Subsequently, per the terms of the NEFs pertaining to the PNP, Caremark assesses the pharmacy a variable rate fee as determined by its performance in the PNP. Caremark determines these variable rate fees after the point of sale on a trimester basis.

31.     Specifically, Caremark calculates participating pharmacies' scores per the PNP's criteria and uses those scores to determine the applicable variable rate fee, called Performance Network Rebate fees ("PNP Fees"). Caremark provides those participating pharmacies with

---

[2] AWP rate refers to the Average Wholesale Price minus the percentage dictated by the NEF. For example, AWP minus 15% means that on a drug with an average wholesale price of $100, the pharmacy receives $85 for this component of its reimbursement.

11

"Trimester Reports" three times a year, for the periods January through April, May through August, and September through December. Caremark then recoups the PNP Fees from participating pharmacies.

32.     The Trimester Reports include information on the pharmacy's (or chain's) scores for each performance criteria and set forth the amount of PNP Fees that Caremark will collect from that pharmacy for applicable claims during that trimester.

33.     Prior to AHF's execution of the Chain Provider Agreements in 2019, Caremark scored each AHF related pharmacy individually.

34.     Generally, Caremark has utilized the following criteria, among others, to measure pharmacy performance: Renin Angiotensin System (RAS) Antagonists Adherence, Statin Adherence, Diabetes Adherence, Specialty Adherence, GAP Therapy (Statin Use in Persons with Diabetes), Comprehensive Medication Review (CMR), Completion Rate (MTM), and Formulary Compliance.

35.     Beginning on January 1, 2018, the PNP incorporated a specialty adherence component in the overall performance score. This component comes into play if more than 25% of the pharmacy's dispensing comes from the specialty drug list for the PNP in any given trimester.

36.     AHF-affiliated pharmacies enrolled in the following PNP networks:

a.   ***Retail Network 24:*** AHF-affiliated pharmacies enrolled in Network 24. Exhibit J-597 (Caremark009243-45). The NEF provides, among other things, "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network 24, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 24 (Network Performance Program) | | | |
| *1-90 Days Supply | 15.1% | 25.0% | $0.50 |

Exh. "6," p. 043

*Id.* The NEF further provides, among other things, that:

> * Provider will be charged a network rebate to the Plan Sponsors that will range from 3% to 5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. Provider's performance score is measured annually in 4 month measurement periods starting January 2016. Within 30 days after the end of a measurement period Caremark will evaluate Provider's performance and determine the associated network rebate amount for that period. Network rebates are deducted from Caremark's pharmacy payments to Provider as a lump sum deduction divided proportionately over the sixteen (16) weeks following each measurement period.

> *Id.*

b. **Retail Network 25:** AHF-affiliated pharmacies enrolled in Network 25. Exhibit J-604 (Caremark009254-56); Exhibit J-605 (Caremark009246-53). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network 25 ('Network'), effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" Exhibit J-604 (Caremark009254-56); Exhibit J-605 (Caremark009246-53). The NEF further provide, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
| --- | --- | --- | --- |
| | Brand | Generic | |
| Medicare Part D Retail Network 25 Network Performance Program | 15.55% | 25.0% | $0.50 |
| *90 Days Supply* | | | |

Exhibit J-604 (Caremark009254-56); Exhibit J-605 (Caremark009246-53). The NEF further provide, among other things, that:

> * Provider will be charged a network variable rate to the Plan Sponsors that will range from 3% to 5% for each brand product total ingredient cost paid and 5% to 7% for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

Exhibit J-604 (Caremark009254-56); J-605 (Caremark009246-53).

c. **Retail Network 36:** AHF-affiliated pharmacies enrolled in Network 36. Exhibit J-598 (Caremark009257-59). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network 36, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is

13

applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 36 (Network Performance Program) | 14.75 % | 25.0% | $1.00 |
| *1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

Provider will be charged a network rebate to the Plan Sponsors that will range from 2.5% to 4.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. Provider's performance score is measured annually in 4 month measurement periods starting January, 2016. Within 30 days after the end of a measurement period, Caremark will evaluate Provider's performance and determine the associated network rebate amount for that period. Network rebates are deducted from Caremark's pharmacy payments to Provider as a lump sum deduction divided proportionately over the sixteen (16) weeks following each measurement period

*Id.*

d. **Retail Network 37:** AHF-affiliated pharmacies enrolled in Network 37 Preferred. Exhibit J-629 (Caremark004273-75); Exhibit J-599 (Caremark009260-62). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the CVS/Caremark Medicare Part D Retail Network 37, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" Exhibit J-629 (Caremark004273-75); Exhibit J-599 (Caremark009260-62). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Disp Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail 37 (Network Performance Program) Preferred | 16.00 % | 25.0% | $.50 |
| *1-90 Days Supply | | | |

Exhibit J-629 (Caremark004273-75); Exhibit J-599 (Caremark009260-62). The NEF further provides, among other things, that:

Provider will be charged a network rebate to the Plan Sponsors that will range from 3.5% to 5.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. Provider's performance score is measured annually in 4 month measurement periods starting January, 2016. Within 30 days after the end of a measurement period, Caremark will evaluate Provider's performance and determine the associated network rebate amount for that period. Network rebates are deducted from Caremark's pharmacy payments to Provider as a lump sum deduction divided proportionately over the sixteen (16) weeks following each measurement period.

Exhibit J-629 (Caremark004273-75); Exhibit J-599 (Caremark009260-62).

e. **Retail Network 38:** AHF-affiliated pharmacies enrolled in Network 38. Exhibit J-600 (Caremark009263-65). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail and Extended Days'

14

Supply (EDS) Network 38, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| | AWP Discount | | Disp Fee | AWP Discount | | Disp Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail and EDS Network 38(Network Performance Program) | 14.25 % | 25.0% | $1.50 | 18.0% | 25.0% | $0.50 |

*EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g. greater than a one-month supply)

*Id.* The NEF further provides, among other things, that:

Provider will be charged a network rebate to the Plan Sponsors that will range from 1.5% to 3.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. Provider's performance score is measured annually in 4 month measurement periods starting January 2016. Within 30 days after the end of a measurement period, Caremark will evaluate Provider's performance and determine the associated network rebate amount for that period. Network rebates are deducted from Caremark's pharmacy payments to Provider as a lump sum deduction divided proportionately over the sixteen (16) weeks following each measurement period.

*Id.*

g. **Retail Network 39:** AHF-affiliated pharmacies enrolled in Network 39 Preferred. Exhibit J-630 (Caremark004276-77); Exhibit J-601 (Caremark009266-68). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the CVS/Caremark Medicare Part D Retail and Extended Days' Supply (EDS) Network 39, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" Exhibit J-631 (Caremark004276-77); Exhibit J-602 (Caremark009266-68). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| | AWP Discount | | Disp Fee | AWP Discount | | Disp Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail and EDS Network 39 (Network Performance Program) Preferred | 15.50 % | 25.0% | $1.00 | 18.50% | 25.0% | $0.00 |

*EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g. greater than a one-month supply)

Exhibit J-630 (Caremark004276-77); Exhibit J-601 (Caremark009266-68). The NEF further provides, among other things, that:

15

- Provider will be charged a network rebate to the Plan Sponsors that will range from 3.5% to 5.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. Provider's performance score is measured annually in 4 month measurement periods starting January, 2016. Within 30 days after the end of a measurement period, Caremark will evaluate Provider's performance and determine the associated network rebate amount for that period. Network rebates are deducted from Caremark's pharmacy payments to Provider as a lump sum deduction divided proportionately over the sixteen (16) weeks following each measurement period.

Exhibit J-630 (Caremark004276-77); Exhibit J-601 (Caremark009266-68).

h. **Retail Network 40:** AHF-affiliated pharmacies enrolled in Network 40 Preferred. J-631, Caremark004280-82. The NEFs provide, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 40, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 40 Performance Network Program - Preferred | | | |
| 1-90 Days Supply | 15.75% | 25.0% | $0.40 |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **5% to 7%** for each brand product total ingredient cost paid or **6.5% to 8.5%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

i. **Retail Network 41:** AHF-affiliated pharmacies enrolled in Network 40 Preferred. Exhibit J-632 (Caremark004283-85). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 41, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 41 Performance Network Program - Preferred | | | |
| 1-90 Days Supply | 16.0% | 25.0% | $0.40 |

*Id.* The NEF further provides, among other things, that:

16

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **3.5% to 5.5%** for each brand product total ingredient cost paid or **6.5% to 8.5%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

k. ***Retail Network 50:*** AHF-affiliated pharmacies enrolled in Network 50. Exhibit J-606 (Caremark009230-32); Exhibit J-607 (Caremark009221-29). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail and Extended Days' Supply Network 50, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" Exhibit J-606 (Caremark009230-32); Exhibit J-607 (Caremark009221-29). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 50 Network Performance Program | 14.75% | 25.0% | $1.00 |
| Medicare Part D Extended Days Supply Network 50 Network Performance Program | 18.5% | 25.0% | $0.25 |

* For participation in the Medicare Part D Extended Days Supply (EDS) Network Provider is also required to participate in the corresponding Retail Network (e.g. Medicare Part D Retail Network 50 and Medicare Part D EDS Network 50).
†EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g. greater than a one-month supply)

Exhibit J-606 (Caremark009230-32); Exhibit J-607 (Caremark009221-29). The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **1.5% to 3.5%** for each product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

Exhibit J-606 (Caremark009230-32); Exhibit J-607 (Caremark009221-29).

l. **Retail Network 51**: AHF-affiliated pharmacies enrolled in Network 51. Exhibit J-608 (Caremark009212-14); Exhibit J-609 (Caremark009203-11). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail and Extended Days' Supply Network 51 ('Network'), effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" Exhibit J-608 (Caremark009212-14); Exhibit J-609 (Caremark009203-11). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 51 Network Performance Program | 14.75% | 25.0% | $1.00 |
| Medicare Part D Extended Days Supply Network 51 Network Performance Program | 18.5% | 25.0% | $0.25 |

* For participation in the Medicare Part D Extended Days Supply (EDS) Network Provider is also required to participate in the corresponding Retail Network (e.g. Medicare Part D Retail Network 51 and Medicare Part D EDS Network 51)
†EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g. greater than a one-month supply)

Exh. "6," p. 048

Exhibit J-608 (Caremark009212-14); Exhibit J-609 (Caremark009203-11). The NEF further provides, among other things, that:

> Provider will be charged a network variable rate to the Plan Sponsors that will range from **2.5%** to **4.5%** for each product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period

Exhibit J-608 (Caremark009212-14); Exhibit J-609 (Caremark009203-11).

m. **Retail Network 55:** AHF-affiliated pharmacies enrolled in Network 55 Preferred. Exhibit J-633 (Caremark004290-92). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 55, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| | AWP Discount | | Dispensing Fee | AWP Discount | | Dispensing Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail Network 55 Performance Network Program - Preferred | 16.0% | 25.0% | $0.50 | 18.75% | 25.0% | $0.00 |

*EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g. greater than a one-month supply)

*Id.* The NEF further provides, among other things, that:

> Provider will be charged a network variable rate to the Plan Sponsors that will range from **3.5%** to **5.5%** of the total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

n. **Retail Network 56:** AHF-affiliated pharmacies enrolled in Network 56 Preferred. Exhibit J-634 (Caremark004293-95). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 56, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is

18

applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| | AWP Discount | | Dispensing Fee | AWP Discount | | Dispensing Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail Network 56 Performance Network Program - Preferred | 17.0% | 25.0% | $0.50 | 18.75% | 25.0% | $0.00 |
| *EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g. greater than a one-month supply) | | | | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from 3.5% to 5.5% of the total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

> *Id.*

o. ***Retail Network 41:*** AHF-affiliated pharmacies enrolled in Network 41 Preferred. Exhibit J-624 (Caremark0004387-89).  The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 41, effective January 1, 2019, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 41 Performance Network Program - Preferred | 16.00% | 25.0% | $0.40 |
| 1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **3.5% to 5.5%** for each brand product total ingredient cost paid or **6.5% to 8.5%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

> *Id.*

p. ***Retail Network 70:*** AHF-affiliated pharmacies enrolled in Network 70. Exhibit J-610  (Caremark009277-84).   The NEF provides, among other things, that

"Provider is hereby enrolled as a provider in the Medicare Part D Retail Network 70, effective January 1, 2019, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 70 Network Performance Program | 15.8% | 25.0% | $0.50 |
| 1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

* Provider will be charged a network variable rate to the Plan Sponsors that will range from **3% to 5%** for each brand product total ingredient cost paid and **5% to 7%** for each generic product total ingredient cost paid based on Provider s performance on the performance criteria outlined in Exhibit A during the measurement period

    *Id.*

q.  **Retail Network 75:** AHF-affiliated pharmacies enrolled in Network 75. Exhibit J-625 (Caremark004391-99). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 75 – Performance Network Program | 16.0%* | 25.0% | $0.50 |

\* In the event changes are made to the Medicare Part D rules that impact this Medicare Part D Retail Network 75 Performance Network Program, and Caremark determines in its sole discretion that such changes make the continuation of the Program infeasible, Caremark reserves the right to discontinue the Program and, unless otherwise notified, the AWP Brand Discount above (16.0%) will no longer apply and the new AWP Brand Discount will be 20.0%, and the network variable rate, the associated Retail Performance Network Program information, the attached Specialty Drug Reimbursement Addendum (SDRA) will all no longer apply, and a replacement SDRA will be issued.

*Id.* The NEF further provides, among other things, that:

* Provider will be charged a network variable rate to the Plan Sponsors that will range from **3% to 5%** for each brand product total ingredient cost paid and **14% to 16%** for each generic product total ingredient cost paid based on Provider s performance on the performance criteria outlined in Exhibit A during the measurement period The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy

    *Id.*

37.   The following NEFs related to the Program went into effect after AHF became a pharmacy chain:

    a.   ***Retail Network 25:*** AHF-affiliated pharmacies enrolled in Network 25. Exhibit J-637 (Caremark008906-07).  The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 25 as indicated in the table below, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 25 Network Performance Program 1-90 Days Supply | 15.55% | 25.0% | $0.50 |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **3% to 5%** for each brand product total ingredient cost paid and **5% to 7%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

    *Id.*

    b.   ***Retail Network 36:*** AHF-affiliated pharmacies enrolled in Network 36.  Exhibit J-638 (Caremark008908). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the CVS/Caremark Medicare Part D Retail Network 36, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 36 (Network Performance Program) 1-90 Days Supply | 14.75% | 25.0% | $1.00 |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from 2 5% to 4.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

    *Id.*

c. **Retail Network 38:** AHF-affiliated pharmacies enrolled in Network 38. Exhibit J-639 (Caremark008909). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the CVS/Caremark Medicare Part D Retail and Extended Days' Supply (EDS) Network 38, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| | AWP Discount | | Disp Fee | AWP Discount | | Disp Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail and EDS Network 38 (Network Performance Program) | 14.25% | 25.0% | $1.50 | 18.0% | 25.0% | $0.50 |

*EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply)

    *Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from 1.5% to 3.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

    *Id.*

d. **Retail Network 50:** AHF-affiliated pharmacies enrolled in Network 50. Exhibit J-640 (Caremark008910-11). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the CVS/Caremark Medicare Part D Retail and Extended Days' Supply (EDS) Network 50, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 50 Network Performance Program | 14.75% | 25.0% | $1.00 |
| Medicare Part D Extended Days Supply Network 50 Network Performance Program | 18.5% | 25.0% | $0.25 |

* For participation in the Medicare Part D Extended Days Supply (EDS) Network Provider is also required to participate in the corresponding Retail Network (e.g., Medicare Part D Retail Network 50 and Medicare Part D EDS Network 50).
*EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply)

    *Id.* The NEF further provides, among other things, that:

Exh. "6," p. 053

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **1.5% to 3.5%** for each product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

e. ***Retail Network 51:*** AHF-affiliated pharmacies enrolled in Network 51. Exhibit J-641 (Caremark008912-13). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the CVS/Caremark Medicare Part D Retail and Extended Days' Supply (EDS) Network 51 as indicated in the table below, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 51 Network Performance Program | 14.75% | 25.0% | $1.00 |
| Medicare Part D Extended Days Supply Network 51 Network Performance Program | 18.5% | 25.0% | $0.25 |

<sup></sup> * For participation in the Medicare Part D Extended Days Supply (EDS) Network Provider is also required to participate in the corresponding Retail Network (e.g., Medicare Part D Retail Network 51 and Medicare Part D EDS Network 51)
† EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply)

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **2.5% to 4.5%** for each product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

f. ***Retail Network 52:*** AHF-affiliated pharmacies enrolled in Network 52. Exhibit J-647 (Caremark008935-42). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| | AWP Discount | | Dispensing Fee | AWP Discount | | Dispensing Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail Network 52 Performance Network Program | 14.75% | 25.00% | $1.00 | 16.50% | 25.00% | $0.25 |

*EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply)

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **4.5% to 6.5%** of the total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy

*Id.*

g. ***Retail Network 70:*** AHF-affiliated pharmacies enrolled in Network 70. Exhibit J-636 (Caremark008914-16). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 70, effective January 1, 2019, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 70 Network Performance Program | | | |
| 1-90 Days Supply | 15.8% | 25.0% | $0.50 |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **3% to 5%** for each brand product total ingredient cost paid and **5% to 7%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

h. ***Retail Network 71:*** AHF-affiliated pharmacies enrolled in Network 71. Exhibit J-649 (Caremark008943-50); Exhibit J-612 (Caremark009285-92). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." Exhibit J-649 (Caremark008943-50); Exhibit J-612 (Caremark009285-92). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 71 – Performance Network Program | | | |
| 1-90 Days Supply | 13.8%* | 25.0% | $0.50 |

Exhibit J-649 (Caremark008943-50); Exhibit J-612 (Caremark009285-92). The NEFs further provide that:

* Provider will be charged a network variable rate to the Plan Sponsors that will range from **5% to 7%** for each brand product total ingredient cost paid and **8.5% to 10.5%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy

Exhibit J-649 (Caremark008943-50); Exhibit J-612 (Caremark009285-92).

i. ***Retail Network 72:*** AHF-affiliated pharmacies enrolled in Network 72. Exhibit J-635 (Caremark0004531-39); Exhibit J-650 (Caremark008951-58); Exhibit J-613 (Caremark009293-300). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein Exhibit J-635 (Caremark0004531-39); Exhibit J-650 (Caremark008951-58); Exhibit J-613 (Caremark009293-300). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 72 – Performance Network Program | 12.0%* | 25.0% | $0.50 |
| 1-90 Days Supply | | | |

* In the event changes are made to the Medicare Part D rules that impact this Medicare Part D Retail Network 72 Performance Network Program, and Caremark determines in its sole discretion that such changes make the continuation of the Program infeasible, Caremark reserves the right to discontinue the Program and, unless otherwise notified, the AWP Brand Discount above (12.0%) will no longer apply and the new AWP Brand Discount will be 19.5%, and the network variable rate, the associated Retail Performance Network Program Information, the attached Specialty Drug Reimbursement Addendum (SDRA) will all no longer apply, and a replacement SDRA will be issued

Exhibit J-635 (Caremark0004531-39); Exhibit J-650 (Caremark008951-58); Exhibit J-613 (Caremark009293-300). The NEF further provides, among other things, that:

* Provider will be charged a network variable rate to the Plan Sponsors that will range from **7.5% to 9.5%** for each brand product total ingredient cost paid and **14% to 16%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy

Exhibit J-635 (Caremark0004531-39); Exhibit J-650 (Caremark008951-58); Exhibit J-613 (Caremark009293-300).

j. **Retail Network 73:** AHF-affiliated pharmacies enrolled in Network 73. Exhibit J-644 (Caremark0004540-47). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 73 – Performance Network Program<br>1-90 Days Supply | 12.0%* | 25.0% | $0.50 |

\* In the event changes are made to the Medicare Part D rules that impact this Medicare Part D Retail Network 73 Performance Network Program, and Caremark determines in its sole discretion that such changes make the continuation of the Program infeasible, Caremark reserves the right to discontinue the Program and, unless otherwise notified, the AWP Brand Discount above (12.0%) will no longer apply and the new AWP Brand Discount will be 21.75%, and the network variable rate, the asso[...] the attached Specialty Drug Reimbursement Addendum (SDR[...] issued

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **10% to 12%** for each brand product total ingredient cost paid and **8% to 10%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy.

    *Id.*[3]

k. **Retail Network 75:** AHF-affiliated pharmacies enrolled in Network 75. Exhibit J-651 (Caremark008959-66); Exhibit J-614 (Caremark009301-08). The NEFs provide, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." Exhibit J-651 (Caremark008959-66); Exhibit J-614 (Caremark009301-08). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 75 – Performance Network Program<br>1-90 Days Supply | 16.0%* | 25.0% | $0.50 |

\* In the event changes are made to the Medicare Part D rules that impact this Medicare Part D Retail Network 75 Performance Network Program, and Caremark determines in its sole discretion that such changes make the continuation of the Program infeasible, Caremark reserves the right to discontinue the Program and, unless otherwise notified, the AWP Brand Discount above (16.0%) will no longer apply and the new AWP Brand Discount will be 20.0%, the network variable rate, the associated Retail Performance Network Program Information, the attached Specialty Drug Reimbursement Addendum (SDRA) will all no longer apply, and a replacement SDRA will be issued

[3] *See also* Caremark0008917-18.

26

Exhibit J-651 (Caremark008959-66); Exhibit J-614 (Caremark009301-08).  The NEF provides, among other things, that:

---

Provider will be charged a network variable rate to the Plan Sponsors that will range from 3% to 5% for each brand product total ingredient cost paid and 14% to 16% for each generic product total ingredient cost paid based on Provider s performance on the performance criteria outlined in Exhibit A during the measurement period The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy

Exhibit J-651 (Caremark008959-66); Exhibit J-614 (Caremark009301-08).

l. **Retail Network 76:** AHF-affiliated pharmacies enrolled in Network 76. Exhibit J-616 (Caremark009309-18).  The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 76 – Performance Network Program<br>1-90 Days Supply | 12.0%* | 25.0% | $0.50 |

*Id.* The NEF further provides, among other things, that:

---

Provider will be charged a network variable rate to the Plan Sponsors that will range from 8% to 10% for each brand product total ingredient cost paid and 17% to 19% for each generic product total ingredient cost paid based on Provider s performance on the performance criteria outlined in Exhibit A during the measurement period The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy

*Id.*

m. **Retail Network 77:** AHF-affiliated pharmacies enrolled in Network 77.  Exhibit J-643 (Caremark0004548-57). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 77 – Performance Network Program<br>1-90 Days Supply | 11.5%* | 25.0% | $0.50 |

The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **10% to 12%** for each brand product total ingredient cost paid and **29% to 31%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy.

*Id.*

n. **AETNA2 Program:** AHF-affiliated pharmacies enrolled in the Aetna2 Program. Exhibit J-615 (Caremark009321-24). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Network Aetna 2, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network AETNA2 Network Performance Program | 15.8% | 25.0% | $0.50 |
| Medicare Part D Retail Network AETNA2 Network Performance Program – Specialty Drug Listing* | 12.0% | N/A | $0.50 |
| †-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **3% to 5%** for each brand product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. No network variable rate will be charged for generic products.

*Id.*

o. **AETNA3 Program:** AHF-affiliated pharmacies enrolled in the Aetna3 Program. Exhibit J-618 (Caremark009325-28); Exhibit J-617 (Caremark009329-32). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Network Aetna3, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." Exhibit J-618 (Caremark009325-28); Exhibit J-617 (Caremark009329-32). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the

Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network AETNA3 Network Performance Program | 12.0%" | 25.0% | $0.50 |
| Medicare Part D Retail Network AETNA3 Network Performance Program – Specialty Drug Pricing List" | "See Specialty Drug Pricing List | N/A | $0.50 |
| 1-90 day supply | | | |

Exhibit J-618 (Caremark009325-28); Exhibit J-617 (Caremark009329-32). The NEF further provides, among other things, that:

• Provider will be charged a network variable rate to the Plan Sponsors that will range from **7% to 9%** for each brand product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. No network variable rate will be charged for generic products.

Exhibit J-618 (Caremark009325-28); Exhibit J-617 (Caremark009329-32).

## V.  **AHF's Scoring Reports**

38.     Included as Exhibit B is a summary of AHF's PNP Fees from January 1, 2016 through November of 2019.

39.     After November 2019, Caremark scored AHF-affiliated pharmacies in the aggregate. In other words, Caremark provides one Trimester Report for the entire chain instead of providing individual Trimester Reports.

40.     The following table reflects AHF's PNP Fees after November 2019:

### *AIDS Healthcare Foundation (Chain Code 7023)*

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2019** | N/A | N/A | $1,535,453 |
| **2020** | $2,979,186 | $2,858,386 | 2,865,141 |

2019: Exhibit J-9 (Caremark004590-99)
2020: Exhibit J-10 (Caremark004568-78); Exhibit J-11 (Caremark004579-89); J-11A (Caremark009493-503)

30

**EXHIBIT A**

| | NCPDP | Name | PSAO | Documents Bates Stamp |
|---|---|---|---|---|
| 1 | 0557984 | AHF - Pharmacy Downtown | LeaderNet | Agency Addendum: Exhibit J-73 (Caremark002797-800)<br>Provider Agreement: Exhibit J-72 (Caremark002801-05) |
| 2 | 0558405 | AHF-Pharmacy Hollywood | LeaderNet | Agency Addendum: Exhibit J-86 (Caremark009452-55)<br>Provider Agreement: Exhibit J-85 (Caremark002810-14) |
| 3 | 0561426 | AHF-Healthcare Center - Westside | LeaderNet | Agency Addendum: Exhibit J-59 (Caremark002815-18)<br>Provider Agreement: Exhibit J-60 (Caremark002819-23) |
| 4 | 0561705 | Hillcrest Pharmacy | ABDC[4] | Agency Addendum: Exhibit R-27 (Caremark002824); Exhibit R-28 (Caremark009473-76)<br>Provider Agreement: Exhibit R-25 (Caremark002825); Exhibit R-26 (Caremark009456-72) |
| 5 | 0569496 | AHF Pharmacy – Valley | LeaderNet | Agency Addendum: Exhibit J-21 (Caremark009481-84)<br>Provider Agreement: Exhibit J-20 (Caremark002827-31) |
| 6 | 0581985 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-47 (Caremark002832-35)<br>Provider Agreement: Exhibit J-46 (Caremark002836-40) |
| 7 | 0904640 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-216 (Caremark002841-44)<br>Provider Agreement: Exhibit J-215 (Caremark002845-49) |
| 8 | 1010254 | AHF Pharmacy Miami | LeaderNet | Agency Addendum: Exhibit J-99 (Caremark002850-53)<br>Provider Agreement: Exhibit J-98 (Caremark002854-58) |
| 9 | 1016509 | AHF Pharmacy Orlando | LeaderNet | Agency Addendum: Exhibit J-112 (Caremark002859-62)<br>Provider Agreement: Exhibit J-111 (Caremark002863-67) |
| 10 | 1016701 | AHF Pharmacy – Safety Harbor | LeaderNet | Agency Addendum: Exhibit J-125 (Caremark002868-72)<br>Provider Agreement: Exhibit J-124 (Caremark002873-77) |
| 11 | 1022792 | AHF Pharmacy Wilton Manors | LeaderNet | Agency Addendum: Exhibit J-138 (Caremark002878-81)<br>Provider Agreement: Exhibit J-137 (Caremark002882-86) |
| 12 | 1036830 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-164 (Caremark002887-90)<br>Provider Agreement: Exhibit J-163 (Caremark002891-95) |
| 13 | 1046108 | AHF Pharmacy – North Point | LeaderNet | Agency Addendum: Exhibit J-203 (Caremark002896-99)<br>Provider Agreement: Exhibit J-202 (Caremark002900-04) |
| 14 | 1047403 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-229 (Caremark002905- |

[4] Hillcrest Pharmacy's use of ABDC as a PSAO predated that pharmacy's affiliation with AHF.

Exh. "6," p. 062

| | | | | 08) |
|---|---|---|---|---|
| | | | | Provider Agreement: Exhibit J-228 (Caremark002909-13) |
| 15 | 1099577 | AHF Healthcare Center - Jacksonville | LeaderNet | Agency Addendum: Exhibit J-34 (Caremark002914-17) Provider Agreement: Exhibit J-33 (Caremark002918-22) |
| 16 | 1162522 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-320 (Caremark002923-26) Provider Agreement: Exhibit J-319 (Caremark002927-35) |
| 17 | 1168396 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-495 (Caremark002936-39) Provider Agreement: Exhibit J-494 (Caremark002940-43) |
| 18 | 1168447 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-507 (Caremark002944-47) Provider Agreement: Exhibit J-506 (Caremark002948-51) |
| 19 | 1169007 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-530 (Caremark002952-55) Provider Agreement: Exhibit J-529 (Caremark002956-59) |
| 20 | 1172129 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-583 (Caremark004560-63) Provider Agreement: Exhibit J-582 (Caremark004564-67) |
| 21 | 1938274 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-464 (Caremark002960-64) Provider Agreement: Exhibit J-463 (Caremark002965-68) |
| 22 | 2591851 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-588 (Caremark002969-72) Provider Agreement: Exhibit J-587 (Caremark002973-76) |
| 23 | 2993928 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-482 (Caremark002977-81) Provider Agreement: Exhibit J-481 (Caremark002982-85) |
| 24 | 3349859 | City View Pharmacy | LeaderNet | Agency Addendum: Exhibit J-563 (Caremark002986-89) Provider Agreement: Exhibit J-562 (Caremark002990-3002) |
| 25 | 3680762 | AHF Pharmacy – Wilders City | LeaderNet | Agency Addendum: Exhibit J-360 (Caremark003003-06) Provider Agreement: Exhibit J-361 (Caremark003007-10) |
| 26 | 3681930 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-438(Caremark003011-15) Provider Agreement: Exhibit J-437 (Caremark003016-31) |
| 27 | 4231914 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-399 (Caremark003040- |

Exh. "6," p. 063

| | | | | 44) |
|---|---|---|---|---|
| | | | | Provider Agreement: Exhibit J-398 (Caremark003045-48) |
| 28 | 4934837 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-335 (Caremark003049-52) |
| | | | | Provider Agreement: Exhibit J-334 (Caremark003053-69) |
| 29 | 4934849 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-348 (Caremark003070-73) |
| | | | | Provider Agreement: Exhibit J-347 (Caremark003074-90) |
| 30 | 5629108 | AHF Pharmacy West Hollywood | LeaderNet | Agency Addendum: Exhibit J-151 (Caremark003091-94) |
| | | | | Provider Agreement: Exhibit J-150 (Caremark003095-99) |
| 31 | 5630517 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-190 (Caremark003100-03) |
| | | | | Provider Agreement: Exhibit J-189 (Caremark003104-08) |
| 32 | 5631812 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-177 (Caremark003109-12) |
| | | | | Provider Agreement: Exhibit J-176 (Caremark003113-17) |
| 33 | 5640722 | AHF Pharmacy Long Beach | LeaderNet | Agency Addendum: Exhibit J-242 (Caremark003118-21) |
| | | | | Provider Agreement: Exhibit J-241 (Caremark003122-25) |
| 34 | 5645025 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-281 (Caremark003126-29) |
| | | | | Provider Agreement: Exhibit J-280 (Caremark003130-34) |
| 35 | 5645049 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-373 (Caremark009489-92) |
| 36 | 5655658 | Hillcrest Pharmacy North | ABDC[5] | Agency Addendum: J-477 (Caremark003143) |
| | | | | Provider Agreement: Exhibit J-476 (Caremark003144-47) |
| 37 | 05705910 | AHF Pharmacy – Sunrise | LeaderNet | Agency Addendum: Exhibit J-268 (Caremark003148-51) |
| | | | | Provider Agreement: Exhibit J-267 (Caremark003152-55) |
| 38 | 5706784 | AHF Pharmacy – South Beach | LeaderNet | Agency Addendum: Exhibit J-255 (Caremark003156-60) |
| | | | | Provider Agreement: Exhibit J-254 (Caremark003161-64) |
| 39 | 5710822 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-294 (Caremark003165-68) |
| | | | | Provider Agreement: Exhibit J-293 (Caremark003169-77) |

[5] Hillcrest Pharmacy's use of ABCD as a PSAO predated that pharmacy's affiliation with AHF.

| 40 | 5716026 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-412 (Caremark003178-82) |
| | | | | Provider Agreement: Exhibit J-411 (Caremark003183-86) |
| 41 | 5735709 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-549 (Caremark003187-90) |
| | | | | Provider Agreement: Exhibit J-548 (Caremark003191-94) |
| 42 | 5736775 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-556 (Caremark003195-98) |
| | | | | Provider Agreement: Exhibit J-555 (Caremark003199-202) |
| 43 | 5739961 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-592 (Caremark003203-06) |
| | | | | Provider Agreement: Exhibit J-591 (Caremark003207-10) |
| 44 | 5805924 | MOMS Pharmacy/AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-307 (Caremark003211-14) |
| | | | | Provider Agreement: Exhibit J-306 (Caremark003215-23) |
| 45 | 5809631 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-425 (Caremark003224-29) |
| | | | | Provider Agreement: Exhibit J-424 (Caremark003230-40) |
| 46 | 5816282 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-519 (Caremark003241-44) |
| | | | | Provider Agreement: Exhibit J-518 (Caremark003245-59) |
| 47 | 5819163 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-540 (Caremark003260-63) |
| | | | | Provider Agreement: Exhibit J-539 (Caremark003264-78) |
| 48 | 5907778 | AHF Pharmacy – FT Worth | LeaderNet | Agency Addendum: Exhibit J-386 (Caremark003279-82) |
| | | | | Provider Agreement: Exhibit J-385 (Caremark003283-86) |
| 49 | 5912349 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-451 (Caremark003287-91) |
| | | | | Provider Agreement: Exhibit J-450 (Caremark003292-96) |
| 50 | 5923811 | AIDS Healthcare Foundation | LeaderNet | Agency Addendum: Exhibit J-572 (Caremark003297-300) |
| | | | | Provider Agreement: Exhibit J-571 (Caremark003301-04) |
| 51 | 6006301 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-578 (Caremark003305-08) |
| | | | | Provider Agreement: Exhibit J-577 (Caremark003309-12) |
| 52 | 4029953 | AIDS Healthcare | LeaderNet | Agency Addendum: Exhibit J-595 (Caremark003032-35) |

34

| | | Foundation | | Provider Agreement: Exhibit J-594 (Caremark003036-39) |
|---|---|---|---|---|

**EXHIBIT B**

### 1. *AHF-Pharmacy Downtown (NCPDP No. 0557984)*

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $6,176      | $6,386      | $6,523      |
| 2017 | $13,827     | $7,048      | $8,176      |
| 2018 | $17,758     | $15,418     | $14,403     |
| 2019 | $12,025     | $17,946     | N/A         |

2016: Exhibit J-74 (Caremark004606-09); Exhibit J-75 (Caremark004640-43); J-76 (Caremark 004672-75)
2017: Exhibit J-77 (Caremark004610-14); Exhibit J-78 (Caremark004644-49); Exhibit J-79 (Caremark004676-81)
2018: Exhibit J-80 (Caremark004615-26); Exhibit J-81 (Caremark004650-58); Exhibit J-82 (Caremark004682-93)
2019: Exhibit J-83 (Caremark004627-39); Exhibit J-84 (Caremark004660-71)

### 2. *AHF-Pharmacy Hollywood (NCPDP No. 0558405)*

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $11,649     | $11,508     | $8,348      |
| 2017 | $13,028     | $9,362      | $12,059     |
| 2018 | $14,503     | $18,175     | $18,991     |
| 2019 | $18,615     | $21,840     | N/A         |

2016: Exhibit J-87 (Caremark004694-97); Exhibit J-88 (Caremark004728-31); Exhibit J-89 (Caremark004760-63)
2017: Exhibit J-90 (Caremark004698-702); Exhibit J-91 (Caremark004732-37); Exhibit J-92 (Caremark004764-69)
2018: Exhibit J-93 (Caremark004703-14); Exhibit J-94 (Caremark004738-46); Exhibit J-95 (Caremark004770-81)
2019: Exhibit J-96 (Caremark004715-27); Exhibit J-97 (Caremark004747-59)

### 3. *AHF-Healthcare Center – Westside (NCPDP No. 0561426)*

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $10,599 | $16,212 | $12,045 |
| 2017 | $14,185 | $17,853 | $16,789 |
| 2018 | $24,257 | $27,841 | $24,698 |
| 2019 | $30,527 | $28,171 | N/A |

2016: Exhibit J-61 (Caremark004782-85); Exhibit J-62 (Caremark004816-19); Exhibit J-63 (Caremark004848-51)
2017: Exhibit J-64 (Caremark004786-90); Exhibit J-65 (Caremark004820-25); Exhibit J-66 (Caremark004852-57)
2018: Exhibit J-67 (Caremark004791-802); Exhibit J-68 (Caremark004826-34); Exhibit J-69 (Caremark004858-69)
2019: Exhibit J-70 (Caremark004803-15); Exhibit J-71 (Caremark004835-47)

### 4. *Hillcrest Pharmacy (NCPDP No. 0561705)* [6]

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2019 | N/A | N/A | $68,418 |
| 2020 | $128,521 | $140,069 | N/A |

2019: Exhibit J-17 (Caremark004971-80)
2020: Exhibit J-18 (Caremark004899-09); Exhibit J-18 (Caremark004940-50)

### 5. *AHF Pharmacy – Valley (NCPDP No. 0569496)*

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $13,732 | $9,004 | $8,885 |
| 2017 | $14,274 | $11,075 | $12,251 |
| 2018 | $16,886 | $13,701 | $10,343 |
| 2019 | $11,857 | $15,368 | N/A |

[6] For NCPDP 0561705, AHF does not seek damages for periods prior to AHF's affiliation with that pharmacy.

2016: Exhibit J-22 (Caremark004981-84); Exhibit J-23 (Caremark005015-18); Exhibit J-24 (Caremark005047-50)
2017: Exhibit J-25 (Caremark004985-89); Exhibit J-26 (Caremark005019-24); Exhibit J-27 (Caremark005051-56)
2018: Exhibit J-28 (Caremark004990-5001); Exhibit J-29 (Caremark005025-33); Exhibit J-30 (Caremark005057-68)
2019: Exhibit J-31 (Caremark005002-14); Exhibit J-32 (Caremark005034-46)

### 6. *AHF Pharmacy (NCPDP No. 0581985)*

|       | Trimester 1 | Trimester 2 | Trimester 3 |
|-------|-------------|-------------|-------------|
| 2016  | $87,275     | $99,963     | $98,970     |
| 2017  | $93,223     | $87,710     | $78,090     |
| 2018  | $101,926    | $117,917    | $106,279    |
| 2019  | $111,003    | $99,960     | N/A         |

2016: Exhibit J-48 (Caremark005069-72); Exhibit J-49 (Caremark005103-06); Exhibit J-50 (Caremark005135-38)
2017: Exhibit J-51 (Caremark005073-77); Exhibit J-52 (Caremark005107-12); Exhibit J-53 (Caremark005139-44)
2018: Exhibit J-54 (Caremark005078-89); Exhibit J-55 (Caremark005113-21); Exhibit J-56 (Caremark005145-56)
2019: Exhibit J-57 (Caremark005090-102); Exhibit J-58 (Caremark005122-34)

### 7. *AHF Pharmacy (NCPDP No. 0904640)*

|       | Trimester 1 | Trimester 2 | Trimester 3 |
|-------|-------------|-------------|-------------|
| 2016  | $18,084     | $20,705     | $13,131     |
| 2017  | $13,637     | $18,633     | $17,971     |
| 2018  | $34,823     | $33,521     | $26,609     |
| 2019  | $34,463     | $35,678     | N/A         |

2016: Exhibit J-217 (Caremark005157-60); Exhibit J-218 (Caremark005191-94); Exhibit J-219 (Caremark005223-26)
2017: Exhibit J-220 (Caremark005161-65); Exhibit J-221 (Caremark005195-200); Exhibit J-222 (Caremark005227-32)
2018: Exhibit J-223 (Caremark005166-77); Exhibit J-224 (Caremark005201-09); Exhibit J-225 (Caremark005233-44)
2019: Exhibit J-226 (Caremark005178-90); Exhibit J-227 (Caremark005210-22)

### 8. *AHF Pharmacy Miami (NCPDP No. 1010254)*

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $11,671 | $11,318 | $7,737 |
| **2017** | $13,065 | $19,455 | $20,855 |
| **2018** | $26,963 | $31,317 | $28,821 |
| **2019** | $30,078 | $24,560 | N/A |

2016: Exhibit J-100 (Caremark005245-48); Exhibit J-101 (Caremark005279-82); Exhibit J-102 (Caremark005311-14)
2017: Exhibit J-103 (Caremark005249-53); Exhibit J-104 (Caremark005283-88); Exhibit J-105 (Caremark005315-20)
2018: Exhibit J-106 (Caremark005254-65); Exhibit J-107 (Caremark005289-97); Exhibit J-108 (Caremark005321-32)
2019: Exhibit J-109 (Caremark005266-78); Exhibit J-110 (Caremark005298-3010)

### 9. *AHF Pharmacy Orlando (NCPDP No. 1016509)*

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $31,906 | $28,954 | $21,703 |
| **2017** | $24,049 | $38,002 | $35,582 |
| **2018** | $59,230 | $69,467 | $59,990 |
| **2019** | $63,268 | $64,053 | N/A |

2016: Exhibit 113 (Caremark005333-36); Exhibit 114 (Caremark005367-70); Exhibit 115 (Caremark005399-402)
2017: Exhibit 116 (Caremark005337-41); Exhibit 117 (Caremark005371-76); Exhibit 118 (Caremark005403-08)
2018: Exhibit 119 (Caremark005342-53); Exhibit 120 (Caremark005377-85); Exhibit 121 (Caremark005409-20)
2019: Exhibit 122 (Caremark005354-66); Exhibit 123 (Caremark005386-98)

### 10. *AHF Pharmacy – Safety Harbor (NCPDP No. 1016701)*

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $44,531 | $49,981 | $44,019 |

39

|  | | | |
|---|---|---|---|
| **2017** | $47,328 | $51,054 | $49,428 |
| **2018** | $81,309 | $78,925 | $70,377 |
| **2019** | $88,287 | $79,745 | N/A |

2016:  Exhibit J-126 (Caremark005421-24); Exhibit J-127 (Caremark005455-58); Exhibit J-128 (Caremark005487-90)
2017: Exhibit J-129 (Caremark005425-29); Exhibit J-130 (Caremark005459-64); Exhibit J-131 (Caremark005491-96)
2018: Exhibit J-132 (Caremark005430-41); Exhibit J-133 (Caremark005465-73); Exhibit J-134 (Caremark005497-508)
2019: Exhibit J-135 (Caremark005442-54); Exhibit J-136 (Caremark005474-86)

## 11. AHF Pharmacy Wilton Manors (NCPDP No. 1022792)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $5,777 | $3,987 | $3,963 |
| **2017** | $6,712 | $7,627 | $6,259 |
| **2018** | $19,281 | $23,072 | $18,356 |
| **2019** | $21,552 | $20,003 | N/A |

2016:  Exhibit J-139 (Caremark005509-12); Exhibit J-140 (Caremark005543-46); Exhibit J-141 (Caremark005575-78)
2017:  Exhibit J-142 (Caremark005513-17); Exhibit J-143 (Caremark005547-52); Exhibit J-144 (Caremark005579-84)
2018:  Exhibit J-145 (Caremark005518-29); Exhibit J-146 (Caremark005553-61); Exhibit J-147 (Caremark005585-96)
2019:  Exhibit J-149 (Caremark005530-42); Exhibit J-150 (Caremark005562-74)

## 12. AHF Pharmacy (NCPDP No. 1036830)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $24,158 | $26,137 | $31,027 |
| **2017** | $31,094 | $36,833 | $35,071 |
| **2018** | $66,370 | $77,316 | $66,231 |
| **2019** | $67,620 | $68,719 | N/A |

40

2016: Exhibit J-165 (Caremark005597-600); Exhibit J-166 (Caremark005631-34); Exhibit J-167 (Caremark005663-66)
2017: Exhibit J-168 (Caremark005601-05); Exhibit J-169 (Caremark005635-40); Exhibit J-170 (Caremark005667-72)
2018: Exhibit J-171 (Caremark005606-17); Exhibit J-172 (Caremark005641-49); Exhibit J-173 (Caremark005673-84)
2019: Exhibit J-174 (Caremark005618-30); Exhibit J-175 (Caremark005650-62)

### 13. AHF Pharmacy – North Point (NCPDP No. 1046108)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $9,507 | $14,462 | $16,896 |
| 2017 | $18,164 | $20,182 | $15,228 |
| 2018 | $29,648 | $30,837 | $35,679 |
| 2019 | $25,449 | $32,372 | N/A |

2016: Exhibit J-204 (Caremark005685-88); Exhibit J-205 (Caremark005719-22); Exhibit J-206 (Caremark005751-54)
2017: Exhibit J-207 (Caremark005689-93); Exhibit J-208 (Caremark005723-28); Exhibit J-209 (Caremark005755-60)
2018: Exhibit J-210 (Caremark005694-705); Exhibit J-211 (Caremark005729-37); Exhibit J-212 (Caremark005761-72)
2019: Exhibit J-213 (Caremark005706-18); Exhibit J-214 (Caremark005738-50)

### 14. AHF Pharmacy (NCPDP No. 1047403)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $7,152 | $5,548 | $6,155 |
| 2017 | $8,080 | $9,976 | $10,090 |
| 2018 | $19,575 | $23,645 | $20,261 |
| 2019 | $24,313 | $26,060 | N/A |

2016: Exhibit J-230 (Caremark005773-76); Exhibit J-231 (Caremark005805-08); Exhibit J-232 (Caremark005838-41)
2017: Exhibit J-233 (Caremark005777-81); Exhibit J-234 (Caremark005809-14); Exhibit J-235 (Caremark005842-47)
2018: Exhibit J-236 (Caremark005782-91); Exhibit J-237 (Caremark005815-24); Exhibit J-238 (Caremark005848-57)
2019: Exhibit J-239 (Caremark005792-804); Exhibit J-240 (Caremark005825-37)

### 15. AHF Healthcare Center Jacksonville (NCPDP No. 1099577)

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $48,372     | $53,781     | $54,154     |
| 2017 | $59,905     | $57,282     | $52,783     |
| 2018 | $101,617    | $108,319    | $99,387     |
| 2019 | $101,599    | $107,197    | N/A         |

2016:  Exhibit J-35 (Caremark005858-61); Exhibit J-36 (Caremark005892-95); Exhibit J-37 (Caremark005924-27)
2017:  Exhibit J-38 (Caremark005862-66); Exhibit J-39 (Caremark005896-901); Exhibit J-40 (Caremark005928-33)
2018:  Exhibit J-41 (Caremark005867-78); Exhibit J-42 (Caremark005902-10); Exhibit J-43 (Caremark005934-45)
2019:  Exhibit J-44 (Caremark005879-91); Exhibit J-45 (Caremark005911-23)

### 16. AHF Pharmacy (NCPDP No. 1162522)

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $7,213      | $10,112     | $7003       |
| 2017 | $9,443      | $7,338      | $9,694      |
| 2018 | $11,723     | $12,594     | $11,127     |
| 2019 | $12,394     | $12,146     | N/A         |

2016:  Exhibit J-321 (Caremark005946-49); Exhibit J-322 (Caremark005980-83); Exhibit J-323 (Caremark006012-15)
2017: Exhibit J-324 (Caremark005950-54); Exhibit J-325 (Caremark005984-89); Exhibit J-326 (Caremark006016-21)
2018: Exhibit J-327 (Caremark005955-66); Exhibit J-328 (Caremark005990-98); Exhibit J-329 (Caremark006022-33)
2019: Exhibit J-330 (Caremark005967-79); Exhibit J-331 (Caremark005999-6011)

### 17. AHF Pharmacy (NCPDP No. 1168396)

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $0          | $1,331      | $4,711      |

Exh. "6," p. 073

| | | | |
|---|---|---|---|
| **2017** | $5,807 | $9,052 | $8,709 |
| **2018** | $16,996 | $14,871 | $16,297 |
| **2019** | $18,543 | $18,075 | N/A |

2016: Exhibit J-496 (Caremark006064-67); Exhibit J-497 (Caremark006096-99)
2017: Exhibit J-498 (Caremark006034-38); Exhibit J-499 (Caremark006068-73); Exhibit J-500 (Caremark006100-05)
2018: Exhibit J-501 (Caremark006039-50); Exhibit J-502 (Caremark006074-82); Exhibit J-503 (Caremark006106-17)
2019: Exhibit J-504 (Caremark006051-63); Exhibit J-505 (Caremark006083-95)

### 18. AHF Pharmacy (NCPDP No. 1168447)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $0 | $793 | $2,947 |
| **2017** | $4,468 | $5,516 | $6,180 |
| **2018** | $13,454 | $16,051 | $11,299 |
| **2019** | $16,354 | $15,322 | N/A |

2016: Exhibit J-508 (Caremark006148-151); Exhibit J-509 (Caremark006180-83)
2017: Exhibit J-510 (Caremark006118-22); Exhibit J-511 (Caremark006152-57); Exhibit J-512 (Caremark006184-89)
2018: Exhibit J-513 (Caremark006123-34); Exhibit J-514 (Caremark006158-66); Exhibit J-515 (Caremark006190-201)
2019: Exhibit J-516 (Caremark006135-47); Exhibit J-517 (Caremark006167-79)

### 19. AHF Pharmacy (NCPDP No. 1169007)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2017** | $635 | $1,155 | $1,189 |
| **2018** | $2,715 | $3,081 | $4,215 |
| **2019** | $3,287 | $3,039 | N/A |

2017: Exhibit J-531 (Caremark006202-06); Exhibit J-532 (Caremark006232-37); Exhibit J-533 (Caremark006260-65)
2018: Exhibit J-534 (Caremark006207-18); Exhibit J-535 (Caremark006238-46); Exhibit J-536 (Caremark006266-77)

2019: Exhibit J-537 (Caremark006219-31); Exhibit J-538 (Caremark006247-59)

### 20. AHF Pharmacy (NCPDP No. 1172129)

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2018 | $0          | $0          | $2,512      |
| 2019 | $12,476     | $11,720     | N/A         |

2018: Exhibit J-584 (Caremark006304-15)
2019: Exhibit J-585 (Caremark006278-90); Exhibit J-586 (Caremark006291-303)

### 21. AHF Pharmacy (NCPDP No. 1938274)

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $5,790      | $12,961     | $18,103     |
| 2017 | $9,906      | $12,155     | $8,871      |
| 2018 | $20,563     | $23,414     | $23,758     |
| 2019 | $33,051     | $35,004     | N/A         |

2016: Exhibit J-465 (Caremark006316-19); Exhibit J-466 (Caremark006345-48); Exhibit J-467 (Caremark006374-77)
2017: Exhibit J-468 (Caremark006320-24); Exhibit J-469 (Caremark006349-54); Exhibit J-470 (Caremark006378-83)
2018: Exhibit J-471) Caremark006325-34; Exhibit J-472 (Caremark006355-63); Exhibit J-473 (Caremark006384-95)
2019: Exhibit J-474 (Caremark006335-44); Exhibit J-475 (Caremark006364-73)

### 22. AHF Pharmacy (NCPDP No. 2591851)

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2019 | $4,263      | $7,916      | N/A         |

2019: Exhibit J-589 (Caremark006396-408); Exhibit J-590 (Caremark006409-21)

### 23. AHF Pharmacy (NCPDP No. 2993928)

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|

44

| | | | |
|---|---|---|---|
| **2016** | $942 | $1,791 | $2,401 |
| **2017** | $3,189 | $4,666 | $6,701 |
| **2018** | $17,479 | $18,253 | $20,041 |
| **2019** | $21,116 | $21,350 | N/A |

2016: Exhibit J-483 (Caremark006422-25); Exhibit J-484 (Caremark006456-59); Exhibit J-485 (Caremark006488-91)
2017: Exhibit J-486 (Caremark006426-30); Exhibit J-487 (Caremark006460-65); Exhibit J-488 (Caremark006492-97)
2018: Exhibit J-489 (Caremark006431-42); Exhibit J-490 (Caremark006466-74); Exhibit J-491 (Caremark006498-509)
2019: Exhibit J-492 (Caremark006443-55); Exhibit J-493 (Caremark006475-87)

### 24. City View Pharmacy (NCPDP No. 3349859) [7]

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | N/A | N/A | N/A |
| **2017** | N/A | $7,568 | $7,215 |
| **2018** | $17,791 | $19,668 | $15,172 |
| **2019** | $27,481 | $32,465 | N/A |

2017: Exhibit J-564 (Caremark006543-48); Exhibit J-565 (Caremark006573-78)
2018: Exhibit J-566 (Caremark006519-28); Exhibit J-567 (Caremark006549-58); Exhibit J-568 (Caremark006579-88)
2019: Exhibit J-569 (Caremark006529-38); Exhibit J-570 (Caremark006559-68)

### 25. AHF Pharmacy – Wilders City (NCPDP No. 3680762)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $4,711 | $9,750 | $16,107 |
| **2017** | $14,170 | $16,287 | $12,069 |
| **2018** | $21,024 | $22,065 | $27,575 |

[7] For NCPDP 3349859, AHF does not seek damages for periods prior to AHF's affiliation with that pharmacy.

45

| 2019 | $21,062 | $21,374 | N/A |
|------|---------|---------|-----|

2016: Exhibit J-362, Caremark006589-92; Exhibit J-363, Caremark006623-26; Exhibit J-364 Caremark006655-58
2017: Exhibit J-365, Caremark006593-97; Exhibit J-366, Caremark006627-32; Exhibit J-367, Caremark006659-64
2018: Exhibit J-368, Caremark006598-609; Exhibit J-369, Caremark006633-41; Exhibit J-370, Caremark006665-76
2019: Exhibit J-371, Caremark006610-22; Exhibit J-372, Caremark006642-54

### 26. AHF Pharmacy (NCPDP No. 3681930)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $6,828      | $5,420      | $6,344      |
| 2017   | $10,046     | $9,484      | $7,373      |
| 2018   | $14,619     | $16,588     | $14,080     |
| 2019   | $13,291     | $12,436     | N/A         |

2016: Exhibit J-439, Caremark006677-80; Exhibit J-440, Caremark006711-14; Exhibit J-441, Caremark006743-46
2017: Exhibit J-442, Caremark006681-85; Exhibit J-443, Caremark006715-20; Exhibit J-444, Caremark006747-52
2018: Exhibit J-445, Caremark006686-97; Exhibit J-446, Caremark006721-29; Exhibit J-447, Caremark006753-64
2019: Exhibit J-448, Caremark006698-710; Exhibit J-449, Caremark006730-42

### 27. AHF Pharmacy (NCPDP No. 4231914)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $1,284      | $1,085      | $809        |
| 2017   | $1,077      | $3,096      | $4,239      |
| 2018   | $3,416      | $3,630      | $4,802      |
| 2019   | $7,132      | $5,641      | N/A         |

2016: Exhibit J-400, Caremark006765-68; Exhibit J-401, Caremark006799-802; Exhibit J-402, Caremark006831-34
2017: Exhibit J-403, Caremark006769-73; Exhibit J-404, Caremark006803-08; Exhibit J-405, Caremark006835-40

Exh. "6," p. 077

2018: Exhibit J-406, Caremark006774-85; Exhibit J-407, Caremark006809-17; Exhibit J-408, Caremark006841-52
2019: Exhibit J-409, Caremark006786-98; Exhibit J-410, Caremark006818-30

### 28. AHF Pharmacy (NCPDP No. 4934837)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $23,301     | $17,760     | $22,174     |
| 2017   | $24,076     | $21,923     | $23,871     |
| 2018   | $28,248     | $23,155     | $20,790     |
| 2019   | $25,732     | $26,757     | N/A         |

2016: Exhibit J-336, Caremark006853-56; Exhibit J-337, Caremark006887-90; Exhibit J-338, Caremark006919-22
2017: Exhibit J-339, Caremark006857-61; Exhibit J-340, Caremark006891-96; Exhibit J-341, Caremark006923-28
2018: Exhibit J-342, Caremark006862-73; Exhibit J-343, Caremark006897-905; Exhibit J-344, Caremark006929-40
2019: Exhibit J-345, Caremark006874-86; Exhibit J-346, Caremark006906-1822

### 29. AHF Pharmacy (NCPDP No. 4934849)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $13,242     | $19,447     | $16,568     |
| 2017   | $13,229     | $12,949     | $12,830     |
| 2018   | $15,594     | $16,266     | $14,695     |
| 2019   | $18,190     | $15,326     | N/A         |

2016: Exhibit J-349, Caremark006941-44; Exhibit J-350, Caremark006975-78; Exhibit J-351, Caremark007007-10
2017: Exhibit J-352, Caremark006945-49; Exhibit J-353, Caremark006979-84; Exhibit J-354, Caremark007011-16
2018: Exhibit J-355, Caremark006950-61; Exhibit J-356, Caremark006985-93; Exhibit J-357, Caremark007017-28
2019: Exhibit J-358, Caremark006962-74; Exhibit J-359, Caremark006994-7006

### 30. AHF Pharmacy West Hollywood (NCPDP No. 5629108)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|

47

| 2016 | $13,344 | $9,782 | $9,382 |
| 2017 | $10,472 | $8,414 | $9,147 |
| 2018 | $14,347 | $12,510 | $9,637 |
| 2019 | $11,822 | $11,293 | N/A |

2016: Exhibit J-152, Caremark007029-32; Exhibit J-153, Caremark007063-66; Exhibit J-154, Caremark007092-95
2017: Exhibit J-155, Caremark007033-37; Exhibit J-156, Caremark007067-72; Exhibit J-157, Caremark007096-101
2018: Exhibit J-158, Caremark007038-49; Exhibit J-159, Caremark007073-81; Exhibit J-160, Caremark007102-13
2019: Exhibit J-161, Caremark007050-62; Exhibit J-162, Caremark007082-91

### 31. AHF Pharmacy (NCPDP No. 5630517)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
| --- | --- | --- | --- |
| 2016 | $20,851 | $19,428 | $18,276 |
| 2017 | $26,085 | $26,674 | $24,089 |
| 2018 | $24,639 | $27,895 | $30,426 |
| 2019 | $26,613 | $30,122 | N/A |

2016: Exhibit J-191, Caremark007114-17; Exhibit J-192, Caremark007148-51; Exhibit J-193, Caremark007180-83
2017: Exhibit J-194, Caremark007118-22; Exhibit J-195, Caremark007152-57; Exhibit J-196, Caremark007184-89
2018: Exhibit J-197, Caremark007123-34; Exhibit J-198, Caremark007158-66; Exhibit J-199, Caremark007190-201
2019: Exhibit J-200, Caremark007135-47; Exhibit J-201, Caremark007167-79

### 32. AHF Pharmacy (NCPDP No. 5631812)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
| --- | --- | --- | --- |
| 2016 | $8,972 | $9,015 | $8,810 |
| 2017 | $7,120 | $8,957 | $9,464 |
| 2018 | $13,197 | $10,873 | $9,102 |
| 2019 | $11,475 | $11,726 | N/A |

2016:  Exhibit J-178, Caremark007202-05; Exhibit J-179, Caremark007236-39; Exhibit J-180, Caremark007268-71
2017:  Exhibit J-181, Caremark007206-10; Exhibit J-182, Caremark007240-45; Exhibit J-183, Caremark007272-77
2018:  Exhibit J-184, Caremark007211-22; Exhibit J-185, Caremark007246-54; Exhibit J-186, Caremark007278-89
2019:  Exhibit J-187, Caremark007223-35; Exhibit J-188, Caremark007255-67

### 33. *AHF Pharmacy Long Beach (NCPDP No. 5640722)*

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $16,702     | $13,424     | $13,061     |
| 2017 | $14,689     | $18,033     | $12,493     |
| 2018 | $20,701     | $22,498     | $20,831     |
| 2019 | $23,050     | $21,668     | N/A         |

2016:  Exhibit J-243, Caremark007290-93; Exhibit J-244, Caremark007324-27; Exhibit J-245, Caremark007356-59
2017:  Exhibit J-246, Caremark007294-98; Exhibit J-247, Caremark007328-33; Exhibit J-248, Caremark007360-65
2018:  Exhibit J-249, Caremark007299-310; Exhibit J-250, Caremark007334-42; Exhibit J-251, Caremark007366-77
2019:  Exhibit J-252, Caremark007311-23; Exhibit J-253, Caremark007343-55

### 34. *AHF Pharmacy (NCPDP No. 5645025)*

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $54,933     | $43,758     | $44,893     |
| 2017 | $48,218     | $44,167     | $40,416     |
| 2018 | $62,252     | $58,303     | $60,718     |
| 2019 | $72,669     | $70,226     | N/A         |

2016:  Exhibit J-282, Caremark007378-81; Exhibit J-283, Caremark007412-15; Exhibit J-284, Caremark007444-47
2017: Exhibit J-285, Caremark007382-86; Exhibit J-286, Caremark007416-21; Exhibit J-287, Caremark007448-53
2018: Exhibit J-288, Caremark007387-98; Exhibit J-289, Caremark007422-30; Exhibit J-290, Caremark007454-65

49

2019: Exhibit J-291, Caremark007399-411; Exhibit J-292, Caremark007431-43

### 35. AHF Pharmacy (NCPDP No. 5645049)

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $54,044     | $46,330     | $36,655     |
| 2017 | $55,848     | $59,692     | $52,749     |
| 2018 | $85,420     | $91,614     | $86,794     |
| 2019 | $112,983    | $116,221    | N/A         |

2016:  Exhibit J-374, Caremark007466-69; Exhibit J-375, Caremark007495-98; Exhibit J-376, Caremark007525-28
2017:  Exhibit J-377, Caremark007470-74; Exhibit J-378, Caremark007499-504; Exhibit J-379, Caremark007529-34
2018:  Exhibit J-380, Caremark007475-84; Exhibit J-381, Caremark007505-14; Exhibit J-382, Caremark007535-44
2019:  Exhibit J-383, Caremark007485-94; Exhibit J-384, Caremark007515-24

### 36. Hillcrest Pharmacy North (NCPDP No. 5655658) [8]

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2019 | N/A         | N/A         | $11,228     |
| 2020 | $18,217     | $20,407     | N/A         |

2019: Exhibit J-478, Caremark007646-55
2020: Exhibit J-479, Caremark007574-84; Exhibit J-480, Caremark007615-25

### 37. AHF Pharmacy – Sunrise (NCPDP No. 05705910)

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $4,786      | $5,142      | $9,251      |
| 2017 | $12,770     | $20,683     | $19,098     |
| 2018 | $28,308     | $25,786     | $19,954     |

[8] For NCPDP 5655658, AHF does not seek damages for periods prior to AHF's affiliation with that pharmacy.

50

| 2019 | $27,507 | $25,680 | N/A |

2016:  Exhibit J-269, Caremark007656-59; Exhibit J-270, Caremark007690-93; Exhibit J-271, Caremark007722-25
2017:  Exhibit J-272, Caremark007660-64; Exhibit J-273, Caremark007694-99; Exhibit J-274, Caremark007726-31
2018:  Exhibit J-275, Caremark007665-76; Exhibit J-276, Caremark007700-08; Exhibit J-277, Caremark007732-43
2019:  Exhibit J-278, Caremark007677-89; Exhibit J-279 Caremark007709-21

### 38. AHF Pharmacy – South Beach (NCPDP No. 5706784)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $10,531 | $9,444 | $9,921 |
| 2017 | $13,799 | $14,018 | $13,045 |
| 2018 | $24,566 | $27,015 | $24,766 |
| 2019 | $32,775 | $34,968 | N/A |

2016:  Exhibit J-256, Caremark007744-47; Exhibit J-257, Caremark007778-81; Exhibit J-258, Caremark007810-13
2017:  Exhibit J-259, Caremark007748-52; Exhibit J-260, Caremark007782-87; Exhibit J-261, Caremark007814-19
2018:  Exhibit J-262, Caremark007753-64; Exhibit J-263, Caremark007788-96; Exhibit J-264, Caremark007820-31
2019:  Exhibit J-266, Caremark007765-77; Exhibit J-267, Caremark007797-809

### 39. AHF Pharmacy (NCPDP No. 5710822)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $4,415 | $6,790 | $5,270 |
| 2017 | $5,472 | $6,433 | $6,757 |
| 2018 | $17,700 | $17,642 | $16,627 |
| 2019 | $16,217 | $26,283 | N/A |

2016:  Exhibit J-295, Caremark007832-35; Exhibit J-296, Caremark007863-66; Exhibit J-297, Caremark007895-98
2017:  Exhibit J-298, Caremark007836-40; Exhibit J-299, Caremark007867-72; Exhibit J-300, Caremark007899-904

2018:  Exhibit J-301, Caremark007841-52; Exhibit J-302, Caremark007873-81; Exhibit J-303, Caremark007905-16
2019:  Exhibit J-304, Caremark007853-62; Exhibit J-305, Caremark007882-94

### 40. AHF Pharmacy (NCPDP No. 5716026)

|       | Trimester 1 | Trimester 2 | Trimester 3 |
|-------|-------------|-------------|-------------|
| 2016  | $4,599      | $5,743      | $5,369      |
| 2017  | $8,984      | $6,766      | $6,162      |
| 2018  | $13,940     | $12,569     | $9,114      |
| 2019  | $13,566     | $20,645     | N/A         |

2016:  Exhibit J-413, Caremark007917-20; Exhibit J-414, Caremark007951-54; Exhibit J-415, Caremark007983-86
2017:  Exhibit J-416, Caremark007921-25; Exhibit J-417, Caremark007955-60; Exhibit J-418, Caremark007987-92
2018:  Exhibit J-419, Caremark007926-37; Exhibit J-420, Caremark007961-69; Exhibit J-421, Caremark007993-8004
2019:  Exhibit J-422, Caremark007938-50; Exhibit J-423, Caremark007970-82

### 41. AHF Pharmacy (NCPDP No. 5735709)

|       | Trimester 1 | Trimester 2 | Trimester 3 |
|-------|-------------|-------------|-------------|
| 2018  | $16,465     | $25,720     | $27,578     |
| 2019  | $19,487     | $23,139     | N/A         |

2018:  Exhibit J-550, Caremark008005-16; Exhibit J-551, Caremark008030-38; Exhibit J-552, Caremark008052-63
2019:  Exhibit J-553, Caremark008017-29; Exhibit J-554, Caremark008039-51

### 42. AHF Pharmacy (NCPDP No. 5736775)

|       | Trimester 1 | Trimester 2 | Trimester 3 |
|-------|-------------|-------------|-------------|
| 2018  | $1,701      | $11,739     | $14,355     |
| 2019  | $14,889     | $11,243     | N/A         |

2018:  Exhibit J-557, Caremark008064-75; Exhibit J-558, Caremark008089-97; Exhibit J-559, Caremark008108-119

2019:  Exhibit J-560, Caremark008076-88; Exhibit J-561, Caremark008098-107

### 43. *AHF Pharmacy (NCPDP No. 5739961)*

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2019** | $0 | $7,542 | N/A |

2019:  Exhibit J-593, Caremark008120-29

### 44. *MOMS Pharmacy/AHF Pharmacy (NCPDP No. 5805924)*

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $87,417 | $99,854 | $80,930 |
| **2017** | $108,541 | $92,941 | $91,691 |
| **2018** | $102,174 | $113,125 | $90,511 |
| **2019** | $155,140 | $143,946 | N/A |

2016:  Exhibit J-308, Caremark008130-33; Exhibit J-309, Caremark008164-67; Exhibit J-310, Caremark008196-99
2017:  Exhibit J-311, Caremark008134-38; Exhibit J-312, Caremark008168-73; Exhibit J-313, Caremark008200-05
2018:  Exhibit J-314, Caremark008139-50; Exhibit J-315, Caremark008174-82; Exhibit J-316, Caremark008206-17
2019: Exhibit J-317, Caremark008151-63; Exhibit J-318, Caremark008183-95

### 45. *AHF Pharmacy (NCPDP No. 5809631)*

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $9,562 | $13,258 | $8,938 |
| **2017** | $11,807 | $19,539 | $18,585 |
| **2018** | $35,842 | $37,702 | $26,592 |
| **2019** | $57,134 | $52,665 | N/A |

2016:  Exhibit J-426, Caremark008218-21; Exhibit J-427, Caremark008252-55; Exhibit J-428, Caremark008284-87

53

2017:  Exhibit J-429, Caremark008222-26; Exhibit J-430, Caremark008256-61; Exhibit J-431, Caremark008288-93
2018:  Exhibit J-432, Caremark008227-38; Exhibit J-433, Caremark008262-70; Exhibit J-434, Caremark008294-305
2019:  Exhibit J-435, Caremark008239-51; Exhibit J-436, Caremark008271-83

### 46. AHF Pharmacy (NCPDP No. 5816282)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $0          | $0          | $2          |
| 2017   | $523        | $1,604      | $5,102      |
| 2018   | $9,680      | $9,422      | $7,549      |
| 2019   | $14,912     | $16,491     | N/A         |

2016: Exhibit J-520, Caremark008364-67
2017: Exhibit J-521, Caremark008306-10; Exhibit J-522, Caremark008336-41; Exhibit J-523, Caremark008368-73
2018:  Exhibit J-524, Caremark008311-22; Exhibit J-525, Caremark008342-50; Exhibit J-526, Caremark008374-85
2019:  Exhibit J-527, Caremark008323-35; Exhibit J-528, Caremark008351-63

### 47. AHF Pharmacy (NCPDP No. 5819163)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2017   | $0          | $373        | $486        |
| 2018   | $6,601      | $13,764     | $12,672     |
| 2019   | $15,588     | $25,566     | N/A         |

2017:  Exhibit J-541, Caremark008411-16; Exhibit J-542, Caremark008439-44
2018:  Exhibit J-543, Caremark008386-97; Exhibit J-544, Caremark008417-25; Exhibit J-545, Caremark008445-56
2019:  Exhibit J-546, Caremark008398-410; Exhibit J-547, Caremark008426-38

### 48. AHF Pharmacy – FT Worth (NCPDP No. 5907778)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $10,751     | $23,040     | $22,739     |
| 2017   | $16,212     | $19,157     | $18,305     |

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2018** | $27,430 | $27,504 | $24,798 |
| **2019** | $34,179 | $29,851 | N/A |

2016:  Exhibit J-387, Caremark008457-60; Exhibit J-388, Caremark008491-94; Exhibit J-389, Caremark008523-26
2017:  Exhibit J-390, Caremark008461-65; Exhibit J-391, Caremark008495-500; Exhibit J-392, Caremark008527-32
2018:  Exhibit J-393, Caremark008466-77; Exhibit J-394, Caremark008501-09; Exhibit J-395, Caremark008533-44
2019:  Exhibit J-396, Caremark008478-90; Exhibit J-397, Caremark008510-22

### 49. AHF Pharmacy (NCPDP No. 5912349)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $6,590 | $7,646 | $9,585 |
| **2017** | $10,889 | $14,771 | $12,306 |
| **2018** | $30,872 | $33,204 | $31,245 |
| **2019** | $30,009 | $30,258 | N/A |

2016:  Exhibit J-452, Caremark008545-48; Exhibit J-453, Caremark008579-82; Exhibit J-454, Caremark008611-14
2017:  Exhibit J-455, Caremark008549-53; Exhibit J-456, Caremark008583-88; Exhibit J-457, Caremark008615-20
2018:  Exhibit J-458, Caremark008554-65; Exhibit J-459, Caremark008589-97; Exhibit J-460, Caremark008621-32
2019:  Exhibit J-461, Caremark008566-78; Exhibit J-462, Caremark008598-610

### 50. AIDS Healthcare Foundation (NCPDP No. 5923811)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2018** | $0 | $3,937 | $5,264 |
| **2019** | $5,649 | $4,626 | N/A |

2018:  Exhibit J-573, Caremark008646-54; Exhibit J-574, Caremark008668-79
2019:  Exhibit J-575, Caremark008633-45; Exhibit J-576, Caremark008655-67

### 51. AHF Pharmacy (NCPDP No. 6006301)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|

| 2018 | $0 | $0 | $955 | |
| 2019 | $1,874 | $1,836 | N/A | |

2018:  Exhibit J-579, Caremark008706-15
2019:  Exhibit J-580, Caremark008680-92; Exhibit J-581, Caremark008693-705

### 52. AIDS Healthcare Foundation (NCPDP No. 4029953)

There are no trimester reports for this pharmacy.

## ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Arbitrator makes the following determinations as to additional facts, conclusions of law and mixed questions of law and fact.

1. It is the NEF that constitutes the agreement to join a particular network.  The NEF's attempt to disclose the rates and the network rebates (hereinafter "rebates" or "DIR") to be charged, if any.  The sign-on to a network does not operate through the Provider Manual changes agreed to by submitting further prescription transactions for reimbursement.  The DIR was recouped by CVS from future reimbursement payments to AHF.

2. Some of the networks in which AHF participates do not have rebates, some have fixed rebates, and some have a range of rebates.  Rebates have been in place for some networks since 2006.  NEF's are presented in the Spring before the next plan year.  AHF was free to accept or reject participating in each particular network although the consequences of not signing on to a particular NEF could have a severe impact on AHF's business.

3. The movement from fixed rebates to variable range rebates was a result of some pharmacies efforts to differentiate themselves based on superior performance.  The rebate ranges resulted in high scoring pharmacies paying a rebate smaller than would have been the case if there was just a fixed rebate.  The converse was also true and pharmacies that

56

received lower scores paid a rebate larger than would have been the case if there was just a fixed rebate. The variable rates were introduced for the 2016 plan year. Paragraph 30 of Stipulated Facts.

4.  However, CVS had considerable bargaining leverage as one of the largest PBM's. A pharmacy would lose out on large amounts of business if it did not sign up to CVS' networks. Those networks were exclusive and there was no alternative if AHF wanted to serve the members of the plans in CVS' networks. The parties did not engage on a level playing field. CVS and its health plan partners set the terms. The growth in the range of the variable DIR's demonstrates the unequal bargaining power. CVS and its plan partners had no competitive check on how much they increased the variable DIR rates. There was no valid business reason presented for the escalating growth in the percentages recouped, and this growth shows unchecked economic power.

5.  Thus, the Arbitrator finds the contracts were adhesive. While the contracts were adhesive, this does not make them unenforceable or result in damages. *Longnecker v. American Exp. Co.*, 23 F. Supp. 3d 1099, 1109 (D. Ariz. 2014).

6.  For the years 2006 through 2015 the DIRs were fixed rates and thus knowable at the outset and at the Point of Sale. The Arbitrator finds these contract terms were not unconscionable. Thus, the fixed rate DIRs are enforceable as agreed.

7.  For the years from 2016 on the DIRs were variable using the "imputed average pharmacy" when no data was available. For these years the DIRs were unknowable when the NEF was entered into and at the Point of Sale. Thus, there was no expectation as to what the variable DIR would entail other than that it would be calculated fairly and applied in a nondiscriminatory manner. The variable DIR calculations were in the

57

discretion of CVS.  Inherent in the contracts were the unstated expectations that CVS would not exercise this discretion to AHF's disadvantage and to AHF's detriment.

8. The calculations to determine the variable DIRs were not actuarially based.  RT Vol. III, 539:11-539:24 (Justice Testimony)[9].  Nor were they based on sound statistical methodologies.  Small variances had disproportionate impact for extremely small samples (e.g., three patients where the physician of one did not prescribe a statin, etc.).  *E.g.*, RT Vol. II; 175:13-176:9 (Patchett Testimony).  Use of these statistically insignificant sample sizes again worked to AHF's disadvantages.  Moreover, for some there was no correction possible.  Of course, pharmacies have no control over what physicians prescribe.   RT Vol II: 176:10-178:1 (Patchett Testimony): RT Vol II: 330:25-331:12 (Redner Testimony).  Some of the calculations were arbitrary, such as applying some average of other pharmacies when there was no data available for the AHF pharmacy.  RT Vol. II: 181:21-183:5 (Patchett Testimony); RT Vol. III: 429;16-432:4: 453:3-18 (Redner Testimony).  This practice is particularly arbitrary as perfect performance (as there was no data showing less than perfect performance) was "punished" with a recoupment across the entirety of the prescriptions filled.  A neutral and fair practice would have treated lack of data situations as perfect performance.  Instead, CVS applied the average score over all pharmacies participating in the network nationwide. *Id.*  The calculations were unfair to AHF and served to benefit CVS disproportionately as it collected revenue for administering the variable program based on unsound and arbitrary methods and benefited CVS in its competition to gain health plan business.

---

[9] "RT" citations refer to the Reporter's Transcript prepared herein and is followed by page and line number and witness information.

9. The upshot of the unsound methodology for the calculation of the variable DIR's was that AHF was unfairly treated to its financial disadvantage and CVS gained unfair economic advantage both in revenue to CVS and passthrough payments to plan sponsors which enhanced CVS' competitive posture.

10. The provisions of, and application of variable DIR's was contrary to the covenant of good faith and fair dealing inherent in the NEF's.

11. Substantively unconscionable contract terms are unenforceable.  As stated in *Clark v. Renaissance West, LLC* (2013) 232 Ariz. 510, 512; *see also* A.R.S. Section 47-2302:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable . . . it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

The variable DIRs as implemented were substantively unconscionable as a matter of law. Having found the variable DIR provisions to be substantively unconscionable, the Arbitrator choses to limit the application of the variable DIR provisions and award damages to AHF.

12. For the years when variable DIRs were applied, the damages suffered by AHF per Claimant's Exhibit 71 were as follows:

    a. 2016:  $2,164,775;

    b. 2017:  $2,503,514;

    c. 2018:  $4,090,475;

    d. 2019:  $4,704,095;

    e. 2020:  $8,696,289.44.

    f. Total:  $22,159,148.44.

13. CVS is enjoined from using and collecting variable DIRs for 2020 and in the future that use the same methodologies as those presented in the claims in this Arbitration.

14. The contract at issue provides that "the expenses of arbitration, including reasonable attorney's fee will be paid" by "the party against whom the final award of the arbitrator(s) is rendered." Joint Exhibit J-13 at p. 51.

15. Claimant seeks a total of $727,239.03 in fees and expenses. Respondent opposes in part the fee and expense request. Specifically, Respondent seeks to subtract $297,300 in unreasonable entries containing block billing, duplicate billing entries and vague entries as to research; $73,500 in fees expended in motions that were unsuccessful and unsuccessful opposition to Respondent's motion to dismiss; $68,000 regarding Claimant's unsuccessful motion for preliminary injunction; $9,050 for Claimant's unsuccessful motion for preliminary injunction; and $13,539.59 for fees incurred by Claimant's in-house counsel.

16. Taking the last item first, fees incurred by in-house counsel are not recoverable. Claimant was represented by outside lawyers who prosecuted the case. No authority has been provided that in-house attorney fees are recoverable where outside counsel handled the case. *Lacer v. Navajo County*, (Ct.App.1984) 141 Ariz. 392 cited by Claimant is not on point. There the in-house lawyers for the County handled the entire case. The Arbitrator finds the distinction determinative.

17. While the block billing entries are flawed, there is a point where every phone call and letter need not be billed separately to be recoverable. Also, while entries labeled "research" without more are flawed, there was research in the matter that was necessary. In addition, the duplicate entries reflect an inefficient staffing of the case where two very

60

experienced attorneys, but no junior attorneys, did all the work. Taking these realities into consideration, the $297,000 deduction for such entries is reduced to $197,000.

18. Under Arizona law time spent on unsuccessful issues or claims may not be compensated. *Schweiger v. China Doll Restaurant, Inc.*, (Ct.App. 1983)138 Ariz. 183,188-89. Thus, $73,550 for unsuccessful claims and failed response to Respondent's motion to dismiss; the $68,000 for the unsuccessful motion for preliminary injunction and the $9,050 for the unsuccessful motion for summary judgment must be deducted. In sum, the total deductions are $361,439.59 for an award of $365,799.44.

19. To the extent not specifically addressed herein, all other questions of fact, conclusions of law and mixed questions of law and fact are determined to be consistent with the findings and Award set forth herein.

## SUMMARY

1. Respondent breached the contract with its application of the PNP resulting in Aids Healthcare Foundation (hereinafter "AHF") being paid less than the contract required in the variable rate DIR years. Respondent did breach the contract for the fixed rate years.

2. Respondent breached the contract by violating the covenant of good faith and fair dealing by implementing the PNP in the variable rate DIR years.

3. It was not necessary to determine if the imposition of the PNP was procedurally unconscionable.

4. The terms of the PNP were substantively unconscionable for the variable rate DIR years.

Exh. "6," p. 092

5. While the contracts were contracts of adhesion, the Award is based on the substantive unconscionability of the variable rate DIR provisions and their operation.

6. The variable rate DIR's as set forth and applied in the years at issue are enjoined going forward. Nothing prevents CVS from moving forward with a fair and nondiscriminatory variable DIR methodology based on sound principles.

7. AHF has sustained $22,696,289.44 in damages and is entitled to recover that amount.

8. AHF is entitled to recover $365,799.44 in arbitration expenses, including reasonable attorney's fees.

9. The administrative fees of the American Arbitration Association totaling $31,071.69 shall be borne by Respondent and the compensation and expenses of the arbitrator totaling $40,455.00 shall be borne by Respondent. Therefore, Respondent has to pay Claimant, an amount of $51,061.69.

## CONCLUSION

Based on the foregoing, the Arbitrator holds that the variable DIR provisions are substantively unconscionable and unenforceable. AHF is entitled to damages in the amount of $22,696,289.44 and arbitration expenses of $365,799.44.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

Dated: November 12, 2021                  William "Zak" Taylor, Arbitrator

61

1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9    Caremark LLC, et al.,                           No. CV-21-01913-PHX-DJH

10                    Petitioners,                    **ORDER**

11    v.

12    AIDS Healthcare Foundation,

13                    Respondent.

14

15          At issue before the Court is whether to confirm or vacate the arbitration award issued

16    on November 12, 2021, against Petitioners Caremark LLC and Caremark PCS LLC

17    (collectively, "Caremark").  On November 12, 2021, Caremark filed an Amended Motion

18    to Vacate or Correct the Arbitration Award ("Motion to Vacate") on the ground that the

19    arbitrator exceeded his authority (Doc. 12).  In addition to responding to the Motion to

20    Vacate, Respondent AIDS Healthcare Foundation ("AHF") filed a cross Motion to

21    Confirm the Final Award and Entry of Judgment ("Motion to Confirm") (Doc. 72).[1]  Both

22    motions are fully briefed.  (*See* Docs. 58, 59, 75, 76).

23          In its initial filing, Caremark also sought to seal this entire action, which the Court

24    subsequently denied.  (Doc. 49).  The Court did, however, allow Caremark to file redacted

25    versions of documents describing Caremark's "incentive-fee formulas" because it found

26    Caremark had made an initial showing that its competitors could obtain an advantage if the

27    ─────────────────────
      [1] Caremark requested oral argument on the matter.  The Court finds that the issues have
28    been fully briefed and oral argument will not aid the Court's decision.  Therefore, the Court
      will deny Caremark's request for oral argument.  *See* Fed. R. Civ. P. 78(b) (court may
      decide motions without oral hearings); LRCiv 7.2(f) (same).

1   formulas were released to the public.  (Doc. 49 at 5) (stating that "at least for now, the
2   incentive-fee formulas and the reimbursement rates should be shielded from public view").
3   The Court then issued an Order that permitted the following docket numbers to remain
4   under seal, without prejudice to later move to unseal: 6, 12, 22, 24, 28, 31, 33, 34, 36, 37,
5   40, and 46.  (Doc. 66).

6       Caremark now brings a Motion for Protective Order, which seeks to retain the
7   redactions to those documents.  (Doc. 67).  As discussed below, the Court finds that any
8   sealing of documents relating to this case is no longer justified and will order the documents
9   listed above to be unsealed.

10  **I.     Background[2]**

11      **A.  The Parties**

12          **a.  AIDS Healthcare Foundation**

13      AHF owns and operates retail pharmacies that serve HIV/AIDS patients, including
14  patients enrolled in Medicare Part D prescription drug program.[3]  (Doc. 12-9 at 16).  Each
15  AHF-affiliated pharmacy submits claims to Caremark for reimbursement.  (*Id.*)

16          **b.  Caremark**

17      Caremark contracts with prescription drug plan sponsors to provide pharmacy
18  benefit management services to the plan's members.  (*Id.*)  Caremark is a pharmacy benefit
19  manager ("PBM").  In this role, it manages the prescription drug benefits of its clients,
20  which includes, as relevant here, government prescription drug plan sponsors.  (*Id.*)

21      Caremark offers several services to its clients, including the administration and
22  maintenance of nation-wide pharmacy networks to provide pharmacy access to its clients'
23  members.  (*Id.* at 17).  Caremark has over 68,000 pharmacies enrolled in its various
24  networks, including AHF-affiliated pharmacies.  (*Id.*)

25  ---
26  [2] The Court will adopt portions of the background section from the arbitrator's Final Award
    Stipulated Facts section.  (Doc. 12-9 at 16–25).  Unless noted otherwise, all facts contained
    herein are stipulated.

27  [3] Medicare Part D provides outpatient prescription drug coverage to Medicare beneficiaries
    enrolled in private plans.  *See* 42 U.S.C. §1395, *et seq.* A Part D plan, which is an insurance
28  plan for prescription drugs, is also a contract that a plan sponsor enters with the Department
    of Health and Human Services.  (Doc. 72 at 9).

### c. Reimbursement Claims

Under the various contract documents, pharmacies agree to provide services in accordance with the terms of those agreements.  (*Id.*)  When a customer fills a prescription at a Caremark network pharmacy, (e.g., an AHF-affiliated pharmacy), the pharmacy submits a reimbursement claim to the customer's prescriptions insurance plan via Caremark, and Caremark adjudicates the claim on behalf of its client—the plan sponsor.  (*Id.*)

This process confirms the prescribed product is covered by the customer's health plan and advises the pharmacy the reimbursement rate at the point of service for the drug in addition to the amount of co-pay the pharmacy should collect from the customer based on its plan coverage.  (*Id.*)

## B. AHF's Dispute

This case arises from an arbitration between the parties involving a breach of contract claim.  (*Id.*)

At issue was Caremark's operation of the Performance Network Program ("PNP"). Under the PNP, Caremark was authorized to take back from pharmacies like AHF public Medicare Part D monies earmarked to pay for prescriptions for people of limited financial means.  (*Id.*)  Caremark then paid that money back to the Part D plan sponsors.  The result was that pharmacies like AHF received less money than the Part D plan sponsors, who received the negotiated reimbursement rates for public Part D monies.  (*Id.*)

AHF alleged the manner in which Caremark applied the PNP breached the agreement between AHF and Caremark and the covenant of good faith and fair dealing. (*Id.*)  AHF also sought a permanent injunction prohibiting Caremark from operating the PNPs and sought damages arising out of Caremark's performance network fees ("PNR Fees") assessed to the pharmacies from January 1, 2016, to 2020.  (*Id.*)

## A. Provider Agreements

Beginning in 2007 and prior to November of 2019, each AHF-affiliated pharmacy entered a separate "Provider Agreement" with Caremark to participate in Caremark's

Networks.  (*Id.* at 18).  On or about November 4, 2019, the AHF pharmacies became a pharmacy chain in Caremark's Networks, and Caremark and AHF executed four provider chain agreements ("Chain Provider Agreements").  (*Id.*)

The contract between AHF and Caremark included four documents:

(1) the Provider Agreements—used to sign up service providers, like AHF, so those providers can participate in Caremark's pharmacy networks (prior to November 4, 2019);

(2) the Chain Provider Agreements (after November 4, 2019);

(3) the Caremark Provider Manuals; and

(4) the Caremark Network Enrollment Forms ("NEFs") used by Caremark to enroll providers, like AHF, in specific Medicare Part D networks.

(*Id.* at 18–19).[4]

The Provider Manual contains various arbitration provisions, which state, "the award of the arbitrator(s) will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof."  (Doc. 12-6 at 118).

**B. Caremark's Performance Network Program and Network Enrollment Forms ("NEF")**

On July 1, 2016, select Caremark Medicare Part D pharmacy networks became part of Caremark's PNP.  (Doc. 12-9 at 24).  To join the PNP, Caremark provided AHF with a NEF, which set forth the rates that Caremark used to reimburse AHF's pharmacies for the filling of prescriptions for a particular year.  (*Id.* at 69).  Under the PNP, Caremark reimbursed pharmacies with a point-of-sale rate in conjunction with a set network fee, which was assessed at the point of sale.  (*Id.* at 24).

On January 1, 2016, instead of assessing a flat network fee, pharmacies were assessed a variable network fee range, contingent on their performance metrics, with the higher performing pharmacies paying the lower fee.  (*Id.*)  Under this scheme, Caremark calculated the participating pharmacies scores per the PNP's criteria and used those scores

---

[4] The Caremark Documents, which are defined in the Provider Manual, are also included in the contract documents.  (*Id.*)

to determine the applicable variable rate fee, called Performance Network Rebate fees ("PNR fees"). (*Id.*) Caremark provided the participating pharmacies with "Trimester Reports" three times a year and then recouped the PNP fees from those pharmacies. (*Id.* at 25). After November 2019, Caremark scored the AHF pharmacies in the aggregate, using one Trimester Report for the entire chain instead of an individual Trimester Report. (*Id.* at 42).

## C. AHF's Claims and Arbitration Proceedings

On November 12, 2019, AHF filed suit with the American Arbitration Association, alleging Caremark's operation of the PNPs breached the agreements between AHF and Caremark and the covenant of good faith and fair dealing. (Doc. 58 at 13). AHF also sought a permanent injunction prohibiting Caremark from operating the PNPs. (*Id.*)

### i. Caremark's Motion to Sever and Dismiss

On May 4, 2020, Caremark filed a Motion to Sever, arguing AHF's claims constituted a class action that the Provider Manual prohibited. (Doc. 12-6 at 98–109). On August 1, 2020, the arbitrator, William "Zak" Taylor ("arbitrator"), denied Caremark's Motion, finding "in a chain pharmacy agreement, which necessarily contemplates a number of pharmacy locations, the plain language of the Arbitration clause from the Provider Manual, permits aggregation of claims the chain has from any contracts and agreements arising from "participation in one or more Caremark networks." (Doc. 12-6 at 122–25).

### ii. Arbitration Hearings, Interim Award, and Final Award

On April 12, 2021, the arbitrator held a five-day evidentiary hearing, where nine witnesses testified and over 690 exhibits were entered into evidence. (Doc. 12-9 at 14). After the arbitrator received testimonial evidence, the parties submitted two rounds of post-hearing briefing. (*Id.*)

The arbitrator considered the following issues:
(1) Whether Caremark breached the contract with its application of the PNP resulting in AHF being paid less than the contract required;
(2) Whether Caremark breached the contract by violating the covenant of good faith and fair dealing by implementing the PNP;
(3) Whether Caremark's imposition of the PNP was procedurally unconscionable;

(4) Whether the terms of the PNP were substantively unconscionable;

(5) Whether the PNP was an unenforceable contract of adhesion;

(6) Whether the PNP should be enjoined;

(7) What, if any, damages AHF sustained; and

(8) Who was the prevailing party.

(Doc. 12-9 at 15).  The arbitrator found for AHF on all the claims.  (*Id.* at 69–75).

The arbitrator then issued a binding Interim Award dated August 3, 2021, followed by issuance of the 62-page Final Award on November 12, 2021.  (*Id.* at 14–75).  The arbitrator awarded AHF $22.6 million in damages, an additional $365,799.44 in arbitration expenses, including reasonable attorney's fees, and held that Caremark was responsible for the entire sum.  (*Id.* at 75).

The arbitrator held the PNPs and the NEFs that implemented them were "adhesive," and that Caremark had "unchecked economic power."  (*Id.* at 70).  He thus found the contracts were "substantively unconscionable as a matter of law" and therefore unenforceable.  (*Id.* at 72).  Accordingly, the arbitrator "limit[ed] the application of the variable [PNR] provisions" and awarded damages to AHF during the years the PNRs applied.  The damages included:  $2,164,775 for 2016; $2,503,514 for 2017; $4,090,475 for 2018; $4,704,095 for 2019; $8,696,289.44 for 2020, for a total of $22,159,148.44.  (*Id.*)  The arbitrator also granted a permanent injunction prohibiting Caremark from operating the PNPs using the methodologies at issue in the arbitration claims because "the calculations to determine the variable [PNRs] were not actuarially based."  (*Id.* at 71).

### iii.   Caremark's Motion to Recalculate Damages Computation

On August 29, 2021, Caremark filed a Motion to Recalculate Damages Computation, arguing the arbitrator should have based the damages award calculation "on the contractual floor of [PNR] fees under the contracts at issue for 2016 through 2020 . . . [awarding] AHF the lowest available [PNR] fees, rather than award[ing] AHF damages based on a return of all [PNR] fees."  (Doc. 12-7 at 2–12).

On September 11, 2021, the arbitrator denied Caremark's Motion, finding Caremark "made a tactical decision not to attack the damages amount sought based on the view that presenting an alternative theory of damages would undercut and detract from its position

1   that no damages at all should be awarded."  (*Id.* at 46).  On November 12, 2021, the

2   arbitrator issued the Final Award.  (Doc. 12-9).

3   **D.  Caremark's Motion to Vacate and AHF's Motion to Confirm**

4   On December 1, 2021, Caremark filed its Amended Motion to Vacate or Correct the

5   Arbitration Award ("Motion to Vacate"), arguing the arbitrator exceeded his authority by

6   an improper consolidation of claims, adopting an irrational damages computation, and

7   increasing the amount of the damages award after the deadline for doing so had passed.

8   (Doc. 12).  On June 24, 2022, AHF filed its Motion to Confirm the Final Award and for

9   Entry of Judgment, in which AHF essentially argues the same points it does in its Response

10  to the Amended Motion to Vacate in addition to requesting attorneys' fees and costs.[5]

11  (Doc. 72).

12  **II.     Legal Standard**

13  Under the Federal Arbitration Act ("FAA"), a party to an arbitration may apply to

14  the Court for an order confirming the arbitration award, and the Court "must grant such an

15  order unless the award is vacated, modified, or corrected as prescribed in sections 10 and

16  11 of [the FAA]."  9 U.S.C. § 9.

17  An arbitration award review is "both limited and highly deferential."  *Comedy Club,*

18  *Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1288 (9th Cir. 2009); *Kyocera Corp. v.*

19  *Prudential–Bache Trade Servs., Inc.*, 341 F.3d 987, 994 (9th Cir. 2003) (en banc) ("The

20  Federal Arbitration Act, 9 U.S.C. §§ 1–16, enumerates limited grounds on which a federal

21  court may vacate, modify, or correct an arbitral award").   "Neither erroneous legal

22  conclusions nor unsubstantiated factual findings justify federal court review of an arbitral

23  award."  *Bosack v. Soward*, 586 F.3d 1096, 1102 (9th Cir. 2009).  Nonetheless, the Ninth

24  Circuit has held that "[a]lthough an arbitrator has great freedom in determining an award,

25  he may not dispense his own brand of industrial justice."  *Garvey v. Roberts*, 203 F.3d 580,

26  588–89 (9th Cir. 2000) (quoting *Pac. Motor Trucking Co. v. Auto. Machinists Union*, 702

27

28  [5] AHF originally filed their Petition to Confirm in California and the case was transferred here, and subsequently dismissed upon stipulation of the parties.  *See AIDS Healthcare Foundation v. Caremark LLC*, No. 2:22–cv–00925–DJH (D. Ariz.) at Doc. 57.

F.2d 176, 177 (9th Cir. 1983)).  The FAA authorizes a court to vacate an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).  "The burden of establishing grounds for vacating an arbitration award is on the party seeking it." *U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010).

Arbitrators "exceed their powers" when the award is "completely irrational" or in "manifest disregard of the law."  *See Comedy Club*, 553 F.3d at 1288; *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 665 (9th Cir. 2012).  "Completely irrational" means an award "fails to draw its essence from the agreement." *Id.*  In other words, an "arbitration award draws its essence from the agreement if the award is derived from the agreement, viewed in light of the agreement's language and context, as well as other indications of the parties' intentions." *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 642 (9th Cir. 2010) (quoting *Bosack*, 586 F.3d at 1106).  Manifest disregard of the law means that "the arbitrators recognized the applicable law and then ignored it." *Luong v. Circuit City Stores, Inc.*, 368 F.3d 1109, 1112 (9th Cir. 2004).  "These grounds afford an extremely limited review authority, a limitation that is designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures." *Kyocera Corp.*, 341 F.3d at 997.

Arbitration awards should be confirmed if the "arbitrators' interpretation was 'plausible.'"  *Employers Ins. of Wausau v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 933 F.2d 1481, 1486 (9th Cir. 1991).  A reviewing court has "no authority to vacate an award solely because of an alleged error in contract interpretation." *Id.*  However, an "award that conflicts directly with the contract cannot be a 'plausible interpretation.'" *Pac. Motor Trucking*, 702 F.2d at 177 (quoting *Federated Employers of Nevada, Inc. v. Teamsters Local No. 631*, 600 F.2d 1263, 1265 (9th Cir. 1979)).

## III.   Discussion

As noted, Caremark seeks to vacate the arbitrator's award and AHF seeks to confirm

it.  The parties have filed extensive briefing on the issues.  A ruling in favor of one motion necessarily means denial of the other.  The Court will also consider Caremark's Motion for Protective Order.

**1.  AHF's Motion to Confirm and Caremark's Motion to Vacate**

Caremark argues that the arbitration award should be vacated for three reasons: (1) the arbitrator improperly consolidated the claims of fifty-one separate pharmacies into a single proceeding, (2) the arbitrator adopted an irrational damages computation, and (3) the arbitrator increased the damages award amount after the deadline for doing so had passed.  (Doc. 12 at 18–29).

**A.  Whether the arbitrator exceeded his authority by consolidating the pharmacies' claims into a single proceeding**

The Provider Manual states, in relevant part:

> Any and all disputes between Provider and Caremark . . . including but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks or exclusion from any Caremark networks, will be exclusively settled by arbitration. This arbitration provision applies to any dispute arising from events that occurred before, on or after the effective date of this Provider Manual.

(Doc. 12-6 at 118).

In the arbitrator's ruling on Caremark's Motion to Sever and to Dismiss, he found the operative contract to be the Chain Provider Agreement of November 4, 2019.  (Doc. 12-6 at 123).  The arbitrator notes "the claims at issue arose from events occurring almost exclusively before then."  (*Id.*)  "Per the Provider Manual provisions incorporated in the agreement on the subject of Arbitration . . . those claims nonetheless are at issue in this Arbitration pursuant to the written provisions of the November 2019 agreement."  (*Id.*)

The arbitrator further found:

> The "Arbitration" section of the [Provider] Manual states that "**any and all disputes** . . . including but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement **or to Provider's participation in one or more Caremark networks** . . . ," are to be

1
2
3
4
5
6

arbitrated.  The Arbitrator interprets this language to mean that the range of issues to be arbitrated need not arise explicitly from the chain pharmacy agreement, but includes any claims not barred by the statute of limitations that the chain has arising from "participation in one or more Caremark networks."  This is application of the plain meaning of the arbitration clause. It does not involve retroactivity but merely allows all cognizable claims existing at the time of the contract that are not precluded by the statute of limitations to be brought in a single arbitration.

7
8
9
10
11
12
13
14

To the extent it is argued that this violates the anti-class action provisions of the arbitration provision, the Arbitrator finds that, in a chain pharmacy agreement, which necessarily contemplates a number of pharmacy locations, the plain language of the Arbitration clause from the Provider Manual, permits aggregation of claims the chain has from any contracts and agreements arising from "participation in one or more Caremark networks." The "one or more" language is instructive that claims arising under multiple subcontracts, such as the four individual state Medicaid agreements here, are within the scope of the arbitration clause. Thus, claims arising prior to the agreement at issue pursuant to prior contracts between the parties are cognizable in this Arbitration even if such contracts were terminated by the November 4, 2019 Agreement.

15
16
17
18
19
20

(Doc. 12-6 at 123) (emphasis in original).

Like in its Motion to Sever, Caremark again argues the consolidation of the claims violates the anti-class action provisions of the Provider Manual.  (Doc. 12 at 18).  To support this argument, Caremark cites to a provision in the Provider Manual that prevents "representative[s] actions or proceeding[s]":

21
22
23
24

All disputes are subject to arbitration on an individual basis, not on a class or representative basis, or through any form of consolidated proceedings, and the arbitrator(s) will not resolve Class Action disputes and will not consolidate arbitration proceedings without the express written permission of all parties to the Provider Agreement.

25

(Doc. 12-6 at 119).

26
27
28

Caremark contends this contractual requirement precluded AHF from consolidating the claims into one arbitration proceeding.  (Doc. 12 at 18).  Specifically, Caremark argues the arbitrator's interpretation of the Provider Manual exceeded his authority because he

1    ignored "the Provider Manual's anticonsolidation clauses and [relied] on the Chain
2    Provider Agreements."  (Doc. 59 at 9).  Caremark argues AHF's claims "predated the
3    Chain Provider Agreements" and thus those "disputes arose under AHF's individual
4    Provider Agreement with Caremark, not under the Chain Provider Agreements." (*Id.* at
5    10).

6         The Court rejects Caremark's arguments because the arbitrator's interpretation was
7    not "completely irrational" or in "manifest disregard of the law."  *See Comedy Club*, 553
8    F.3d at 1288.  The arbitrator plainly found, under the arbitration section of the Provider
9    Manual, that the plain language from the parties' Provider Manual permitted consolidation
10   of claims from *any contracts and agreements* which arose from "participation in one or
11   more of Caremark networks."  (Doc. 12-6 at 123) (emphasis added).  The arbitrator found
12   this to be "the plain meaning of the arbitration clause" and noted "[i]t does involve
13   retroactivity but merely allows all cognizable claims existing at the time of the contract
14   that are not precluded by the statute of limitations to be brought in a single arbitration."
15   (*Id.*)  He then interpreted the Chain Provider Agreements to mean that "the range of issues
16   to be arbitrated need not arise explicitly from the chain pharmacy agreement, but includes
17   any claims not barred by the statute of limitations that the chain has arising from
18   'participation in one or more Caremark networks."  (*Id.*)  On this basis, the arbitrator ruled
19   that the "'one or more' language is instructive that claims arising under multiple
20   subcontracts, such as the four individual state Medicaid agreements here, are within the
21   scope of the arbitration clause."  (*Id.*)  He therefore concluded that "claims arising prior to
22   the agreement at issue pursuant to prior contracts between the parties are cognizable in this
23   Arbitration even if such contracts were terminated by the November 4, 2019 Agreement."
24   (*Id.*)

25        This outcome finds support in the case law.  The arbitrator interpreted the Provider
26   Agreement, the Provider Manual, and the Chain Provider Agreements, and his ruling "drew
27   its essence" from the operative agreements, considered "the agreement's language and
28   context," and thus cannot be deemed "completely irrational."  *See Lagstein*, 607 F.3d at

1  642.

2        Caremark further argues the arbitrator's decision was in manifest disregard for the

3  law because he ignored both *Lamps Plus, Inc. v. Varela,* 139 S. Ct. 1407, 1416 (2019) and

4  *Weyerhaeuser Co. v. W. Seas Shipping Co.*, 743 F.2d 635, 637 (9th Cir. 1984)—the two

5  cases Caremark cited in its Motion to Sever.  (Doc. 59 at 11).  But manifest disregard of

6  the law "means something more than just an error in the law or a failure on the part of the

7  arbitrators to understand or apply the law." *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879

8  (9th Cir. 2007).  "It must be clear from the record that the arbitrators recognized the

9  applicable law and then ignored it." *Id.*  Here, Caremark has not proffered any evidence

10 that the arbitrator identified an applicable law and then ignored it.  Caremark argues *Lamps*

11 *Plus* and *Weyerhaeuser* stand for the proposition that consolidated arbitrations must be

12 based on express contract authority.  The arbitrator, however, found such authority under

13 the arbitration section of the Provider Manual.  He then interpreted the plain language of

14 the Provider Manual to permit the consolidation of claims from any contracts and

15 agreements which arose from "participation in one or more of Caremark networks."  (Doc.

16 12-6 at 123).  He further explains that "[a]bsent a court order or agreement of the parties,

17 the Arbitrator does not have authority to sever claims or to create multiple arbitrations."

18 (Doc. 12-6 at 123).  It is Caremark's burden to provide such evidence, and they have failed

19 to do so.  *Bosack*, 586 F.3d at 1104–05.  The Court therefore rejects Caremark's argument

20 that the arbitrator manifestly disregarded the law when he resolved the AHF's claims in a

21 single proceeding.

## B.  Whether the arbitrator adopted an irrational damages computation

23       The Court similarly finds the arbitrator did not adopt an irrational damage

24 computation.  His conclusions that that Caremark's NEFs were adhesive, substantively

25 unconscionable, and unenforceable were plausible interpretations of the contract.

26 Accordingly, his finding that Caremark must pay back to AHF all the monies Caremark

27 took pursuant to the NEFs was not irrational.

28       In the Final Award, the arbitrator found that Caremark's NEFs "attempt to disclose

the rates and [performance] network rebates ("PNR") . . . ." (Doc. 12-9 at 69).  The variable PNRs began in 2016.  He notes the movement from fixed rebates to variable range rebates "was [the] result of some pharmacies' efforts to differentiate themselves based on superior performance."  (*Id.*)

From 2006 to 2015, the arbitrator found the fixed rate PNRs were enforceable and not unconscionable.  (*Id.*)  But, starting in 2016, the arbitrator found the PNR rates were variable and unconscionable as implemented because they "were unknowable when the NEF was entered into and at the Point of Sale."  (*Id.*)  The arbitrator found Caremark's calculation of the variable PNR fees contained several flaws, including that the PNR fees "were not actuarially based" or "based on sound statistical methodologies." (*Id.* at 71).

Based on these findings, the arbitrator found Caremark "breached the contract with its application of the PNP resulting in AHF being paid less than the contract required in the variable PNR years."  (Doc. 12-9 at 74).  He further found "[t]he provisions of, and application of variable [PNRs] was contrary to the covenant of good faith and fair dealing inherent in the NEF's."  (*Id.* at 72).  The arbitrator held the "variable [PNRs] as implemented were substantively unconscionable as a matter of law."  (*Id.*)  As a result, he chose to "limit the application of the variable [PNRs] provisions" and award damages to AHF for the years the variable PNRs applied.  (*Id.*)  The damages included: $2,164,775 for 2016; $2,503,514 for 2017; $4,090,475 for 2018; $4,704,095 for 2019; $8,696,289.44 for 2020, for a total of $22,159,148.44.  (*Id.*)

Thereafter, Caremark filed a Motion to Recalculate Damages, arguing that the arbitrator's award provided a windfall to AHF "by eliminating the contractual floor PNR fees that AHF knew was the minimum it would pay when it agreed to participate in Caremark's Medicare part D performance networks" and thus requested the arbitrator "to modify the damages calculation to award AHF damages based on the contractual floor of [PNR] fees under the NEFs, not based on a full refund of those fees."  (Doc. 12-7 at 2–12; 80).  Caremark claimed that when AHF joined Caremark's PNP, AHF knew there was a minimum (3%) fee for pharmacies with perfect performance and knew it would never pay

0% in PNR fees because that could not occur under the PNP.  (*Id.*)  Thus, Caremark contends the damages should be measured based on the lowest available contractual rate rather than on a rate of 0%.  (*Id.*)  This computation, Caremark argues, results in a damages award of $2,710,305, not $19,276,611.  (*Id.*)  The arbitrator rejected this argument, finding:

> Caremark's Motion is an attempt to raise an after-the-fact argument on damages for the first time.  It is not a motion to correct a mathematical error or a calculation error in the sense contemplated by the AAA Rules.  [AHF] has been consistent throughout that it seeks to invalidate the entire network rebate amount as the product of an unconscionable contract term.  The Interim Award so found and held.  [Caremark's] argument seeks to substantially reduce the damages awarded and is not a recalculation but an argument as to an alternative theory of damages.  [Caremark] did not raise its alternative damages theory in its prehearing brief; it did not raise the argument during the hearing; it did not raise the argument in its initial post-hearing brief; and it did not raise the argument in its responsive post-hearing brief.  Rather, it "sandbagged" the issue and raised it as a "gotcha" motion.
>
> The Arbitrator concludes that [Caremark] made a tactical decision not to attack the damages amount sought based on the view that presenting an alternative theory of damages would undercut and detract from its position that no damages at all should be awarded.  This is a common decision faced by trial counsel.  [Caremark] made the decision to hold off on presenting this alternative theory of damages.  This ruling holds [Caremark] to the choice it voluntarily made.

(Doc. 12-7 at 45–46).

Like in its Motion to Recalculate Damages, Caremark contends the arbitrator should have awarded no damages at all because, "as high-performing pharmacies, AHF paid less in PNR fees than they would have paid in a fixed-rate network with a midpoint rate, thus making their damages $0."  (*Id.*)  Alternatively, Caremark argues AHF's maximum contract damages are $2,987,474.38, which "represents the difference between the PNR fees AHF knew they would have to pay under any circumstances ($19,171,674.06) and the PNR fees Caremark charged AHF after the alleged improper scoring ($22,159,148.44)."  (*Id.*)

After reviewing the record, the Court agrees with the arbitrator that Caremark failed

- 14 -

to raise its alternative damages theory in its prehearing brief, during the hearing, in its initial post-hearing brief, or in its responsive post-hearing brief. (Doc. 12-7 at 45–46). The first time Caremark advanced this theory was in its Motion to Recalculate. (*Id.*) Caremark was on notice of the measurement the arbitrator used to calculate AHF's damages. Indeed, the arbitrator expressly adopted damages according to AHF's calculations, citing to AHF's Exhibit 71 in the Final Award. (Doc. 12-9 at 72). As noted, Caremark "made a tactical decision not to attack the damages amount sought based on the view that presenting an alternative theory of damages would undercut and detract from its position that no damages at all should be awarded." (Doc. 12-7 at 45–46). Thus, the arbitrator's conclusion that Caremark forfeited this argument when it failed to raise it during the proceedings was not irrational or in manifest disregard of the law. The arbitrator clearly stated Caremark's Motion was "not a motion to correct a mathematical error or a calculation error in the sense contemplated by the AAA Rules." (*Id.*) This interpretation was plausible, and it is "not the province of the district court . . . to determine whether the arbitrator committed an error, even a serious error, in [his] interpretation [of the rules]." *Sanchez v. Elizondo*, 878 F.3d 1216, 1223 (9th Cir. 2018) (internal citation omitted). The Court "need only determine that the arbitrator confined himself to the interpretation and application of the parties' agreement," which stated that AAA Rules applied. *Id.* Because the Court finds the arbitrator did so here, he did not exceed his authority in adopting AHF's damages computation for the years the variable PNR fees applied.

**C. Whether the arbitrator increased the damages award amount after the deadline for doing so had passed**

Last, the Court finds the arbitrator plausibly interpreted the American Arbitration Association ("AAA") Commercial Rule 50 as inapplicable to AHF's Motion to Correct the Damages Award. Rule 50 states:

> Within 20 calendar days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already

1    decided.

2    AAA Commercial R-50.

3         The arbitrator issued his Interim Award on August 3, 2021.  (Doc. 12-9 at 14).  AHF

4    filed a Motion to Correct the Interim Award on September 14, 2021, arguing the arbitrator

5    did not include the damages for the third trimester of 2020, which Caremark took after the

6    Interim Award was issued.  (Doc. 12-7 at 48).  On October 27, 2021, the arbitrator found

> [t]he Motion correctly points out a mistake regarding correction in the
> original damages and also, as this is an Interim Award, establishes that the
> amounts recouped after the Interim Award for the plan year 2020 should be
> added to the damages.  As the Award was interim in nature, it is subject to
> revision at any time before the Final Award and the time limits of AAA Rule
> 50 do not apply.  Thus, the damages to be awarded are $22,159,148.44.

(Doc. 12-8 at 5–6).

         Caremark contends the arbitrator exceeded his authority by increasing the damages

award amount after the deadline for doing so had passed.  (Doc. 12 at 27–29).  But the

Ninth Circuit is clear that "the arbitrator's interpretation of the scope of his powers is

entitled to the same level of deference as his determination on the merits." *Schoenduve*

*Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 733 (9th Cir. 2006).  Here, the arbitrator found

Rule 50, including its time restrictions, did not apply because it was an Interim Award.

Caremark correctly notes Rule 50 states the arbitrator "is not empowered to redetermine

the merits of any claim already decided."  AAA Commercial R-50.  But the arbitrator did

not redetermine the merits; he acknowledged "a mistake regarding correction in the

original damages . . . [and] that the amounts recouped after the Interim Award . . . should

be added to the damages."  (Doc. 12-8 at 5).  Thus, the Court finds the arbitrator plausibly

interpreted the time limits of Rule 50 as inapplicable to the Interim Award.  Caremark may

take issue with this interpretation, but such alleged errors are insufficient to vacate, in

whole or in part, an arbitration award.  *See Collins*, 505 F.3d at 879.

         Because Caremark has not raised any meritorious argument in favor of vacatur, the

Court "must grant" AHF's application for confirmation of the award and enter judgment.

9 U.S.C. § 9.

- 16 -

**D. AHF's Attorneys' Fees, Prejudgment Interest, Postjudgment Interest**

AHF has requested an award of its reasonable attorneys' fees and costs incurred in seeking confirmation of the arbitration award, which Caremark opposes. (Doc. 72 at 13–18). AHF also seeks prejudgment interest and postjudgment interest. (*Id.*)

**i.   Post-Arbitration Attorneys' Fees**

Although the FAA is silent as to attorney's fees to a party who is successful in obtaining confirmation of an arbitration award, *Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir. 1994), AHF notes the Provider Manual provides that "[t]he expenses of arbitration, including reasonable attorney's fees, will be paid for by the party against whom the final award of the arbitrator(s) is rendered, except as otherwise required by Law." (Doc. 75-1 at 4). The Court is not persuaded this language extends beyond the arbitration proceedings to confirmation of the final award by the district court. In *In re Arb. Proceeding Between: Scottsdale Ins. Co. v. John Deere Ins. Co.*, this court granted respondent's request for attorneys' fees because the parties' agreement provided "the attorneys' fees of the party so applying and court costs will be paid by the party against whom confirmation is sought." 2016 WL 627759, at *4 (D. Ariz. Feb. 17, 2016). This contractual language is specific to the final award's confirmation process. The language in the Provider Manual at issue here, however, appears to be limited to the arbitration itself, not the subsequent confirmation proceedings in the district court.

Nonetheless, AHF contends A.R.S. § 12-1514, a provision of the Arizona Uniform Arbitration Act, provides express statutory authority for an award of attorneys' fees and costs. (Doc. 72 at 14). A.R.S. § 12-1514 states, "[u]pon the granting of an order confirming, modifying or correcting an award, judgment or decree shall be entered in confirmity [sic] therewith and be enforced as any other judgment or decree. Costs of the application and of the proceedings subsequent thereto, and disbursements may be awarded by the court." The Arizona Supreme Court has interpreted the statute's use of "costs" to include attorneys' fees. *See Canon Sch. Dist. No. 50 v. W.E.S. Const. Co.*, 882 P.2d 1274, 1280 (Ariz. 1994) ("Therefore, we conclude that, under A.R.S. § 12-1514, the trial court

- 17 -

1    may make an award for attorney's fees incurred in the confirmation proceedings
2    themselves."). Caremark argues the FAA governs this matter, not A.R.S. § 12-1514. (Doc.
3    75 at 5). But under the Provider Manual, the "Law" that encompasses the expenses of
4    arbitration is defined to include "any federal, state, [or] local . . . . law." (Doc. 76 at 48).
5    The Court therefore finds the agreement between the parties incorporates A.R.S. § 12-
6    1514, which authorizes an award of attorney's fees upon confirmation of an arbitration
7    award. AHF is accordingly entitled to attorneys' fees and costs under A.R.S. § 12-1514.

8        In the alternative, Caremark argues that AHF's proposed fee award should be
9    reduced because of improper block billing, arguing AHF's billing entries contain
10   $67,488.75 in block-billed entries and any fees awarded to them should be reduced by this
11   amount. (Doc. 75-2 at 2–6).

12       In Arizona, block-billed entries contain multiple individual and unrelated tasks.
13   *Moshir v. Automobili Lamborghini Am. LLC*, 927 F. Supp. 2d 789, 799 (D. Ariz. 2013).
14   "[B]lock-billing makes it nearly impossible for the Court to determine the reasonableness
15   of the hours spent on each task. *Id.* Accordingly, "[w]here the Court cannot distinguish
16   between the time claimed for the various tasks, the Court will reduce the award . . . ." *Id.*
17   The Ninth Circuit has stated it is permissible "to reduce block-billed hours by ten to thirty
18   percent based upon a report that block billing inflated billed hours by that percentage
19   range." *Moon v. Am. Fam. Mut. Ins. Co. SI*, 2018 WL 3729762, at *3 (D. Ariz. Aug. 6,
20   2018) (citing to *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007)).

21       Arizona District Court Local Rule 54.2 provides, in part, that a litigant seeking an
22   award of attorney's fees must provide: "(A) The date on which the service was performed;
23   (B) the time devoted to each individual unrelated task performed on such day; (C) a
24   description of the service provided; and (D) the identity of the attorney, paralegal, or other
25   person performing such service." LRCiv 54.2 (e)(1)(A)–(D).

26       Caremark contends that AHF's billing entries are "block-billed" because they
27   contain "multiple individual and unrelated tasks." (Doc. 75 at 7). Upon review, the Court
28   finds the entries do not describe the time spent on each individual task and therefore do not

1    comply with Rule 54.2 and thus make it impossible for the Court to ascertain whether the

2    time spent on each task was reasonable.  The Court therefore finds it appropriate to reduce

3    the hours expended on these block-billed activities by 15%, calculated as follows:

4            $67,488.75[6] * 0.15% = $10,123.31

5            $124,456.40 – 10,123.31 = $114,333.09.

6            Under these adjustments, the Court will award attorneys' fees and costs in the sum

7    of $114,333.09.

8    **ii.    Prejudgment Interest**

9            AHF also seeks prejudgment interest from the date the arbitrator issued his final

10   arbitration award, November 12, 2021, through the date their Motion to Confirm was filed,

11   June 24, 2022.   (Doc. 72 at 15).

12           In diversity cases such as this one, the Court reviews state law to determine the rate

13   of prejudgment interest, while federal law determines the rate of post judgment interest.

14   *Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988).  In Arizona,

15   an award of prejudgment interest is allowed as a matter of right on a liquidated claim.  *See*

16   *Creative Builders, Inc. v. Ave. Devs., Inc.*, 715 P.2d 308, 313 (Ariz. Ct. App. 1986) (internal

17   citation omitted).  "Interest that accumulates from the time an arbitration award is issued

18   until the time a judgment from the district court affirming the arbitration award is entered

19   is considered pre-judgment interest." *TSYS Acquiring Sols., LLC v. Elec. Payment Sys.,*

20   *LLC*, 2010 WL 1781015, at *4 (D. Ariz. May 4, 2010) (citing *Northrop*, 842 F.2d at 1155–

21   56)).  "Courts do not lack authority to award interest where an arbitration award is silent."

22   *Lagstein*, 725 F.3d at 1055.

23           If awarded, "[i]nterest on any judgment shall be at the lesser of ten per cent per

24   annum or at a rate per annum that is equal to one per cent plus the prime rate as published

25   by the board of governors of the federal reserve system in statistical release H.15…."

26   A.R.S. § 44-1201(B).  The Federal Reserve's prime rate is 4.75%.[7]  Thus, the prejudgment

---

[6] These entries contained herein include the entire list of objectionable entries raised by Caremark.  (Doc. 75-2 at 2–6).

[7] H.15, Selected Interest Rates, is available on the Federal Reserve's website.  *See* Board

1   interest here is 5.75%, which is the federal reserve's prime rate plus 1%.

2        Caremark argues AHF's request is untimely because it failed to make the request

3   for prejudgment interest before the arbitrator.  (Doc. 75 at 8).  Caremark further argues

4   prejudgment interest is only allowed as a matter of right on a liquidated claim and, because

5   the damages the arbitrator awarded were not "capable of precise computation," the

6   damages were not liquidated.  (*Id.* at 9).  The Court rejects Caremark's arguments.  The

7   Ninth Circuit is clear that "[w]hile the arbitrators' explicit award of interest on the contract

8   damages should be respected, their failure to speak on interest otherwise does not constitute

9   a denial of interest on other parts of the award."  *Lagstein*, 725 F.3d at 1055.  Although the

10   arbitrator found AHF's request for prejudgment interest "came too late," the arbitrator did

11   not make a determination of whether prejudgment interest should be awarded for the dates

12   at issue here. (Doc. 12-8 at 5).  Further, Caremark cites no authority to support its argument

13   that, "the damages the arbitrator awarded were not capable of precise computation and thus

14   were not liquidated."  (Doc. 75 at 9).  To the contrary, the arbitrator adopted the damages

15   in accordance with the damages put forth by AHF. (Doc. 12-9 at 72).  The Court therefore

16   finds AHF is entitled to prejudgment interest at the rate of 5.75%.

17        Here, the arbitrator issued the Final Award on November 12, 2021.  AHF filed this

18   motion on June 24, 2022.  The Court thus finds $815,608.64 in prejudgment interest has

19   accrued, calculated as follows:

20        $23,113,158.57 * 5.75% = $1,329,006.62.

21        $1,329,006.62/365 days = $3,641.11 per day.

22        224 days from November 12, 2021, to June 24, 2022.

23        224 days * $3,641.11 = $815,608.64.[8]

24   **iii.**   **Postjudgment Interest**

25        AHF also seeks postjudgment interest from the date this Court enters judgment.

26

27   of Governors of Federal Reserve System, H. 15 https://www.federalreserve.gov/releases/h15/

28   [8] The Court notes Caremark does not object to AHF's calculations, only that AHF should not be awarded prejudgment interest.  (Doc. 75 at 8).

1    (Doc. 72 at 17–18).

2         Even in diversity cases "[p]ost-judgment interest is determined by federal law."

3    *Northrop Corp.*, 842 F.2d at 1155.  "Post-judgment interest on a district court judgment is

4    mandatory per 28 U.S.C. § 1961."  *Lagstein*, 725 F.3d at 1056 (internal citation omitted).

5    Under 28 U.S.C. § 1961(a), "[i]nterest shall be allowed on any money judgment in a civil

6    case recovered in a district court."  Postjudgment interest ". . . shall be calculated from the

7    date of the entry of the judgment, at a rate equal to the weekly average 1-year constant

8    maturity Treasury yield, as published by the Board of Governors of the Federal Reserve

9    System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961.  The

10   current weekly average 1-year constant maturity treasury yield is 2.92%.  (Doc. 72-1 at ¶

11   17).  "Post-judgment interest should be awarded on the entire amount of the judgment,

12   including any pre-judgment interest."  *Lagstein*, 725 F.3d at 1056 (internal citation

13   omitted).

14        Here again, Caremark argues AHF's request is untimely because it failed to make

15   the request for postjudgment interest before the arbitrator.  (Doc. 75 at 9).  Caremark further

16   argues postjudgment interest should only accrue from the date the Court enters its order

17   confirming the arbitration award, not from the date on which AHF filed its Motion to

18   Confirm.  (*Id.*)  First, the Court rejects Caremark's argument about untimeliness for the

19   same reasons as described above.  Second, the Ninth Circuit has stated "post-judgment

20   interest is awarded from the date of judgment until the judgment is satisfied."  *Lagstein*,

21   725 F.3d at 1056.  On that basis, the Court will award postjudgment interest from the date

22   of this opinion until the date of payment.

23        **2.  Motion for Protective Order**

24        As noted above, in its initial filing, Caremark sought to seal this entire action, which

25   the Court subsequently denied.  (Doc. 49).  The Court did, however, allow Caremark to file

26   redacted versions of documents containing descriptions of Caremark's "incentive-fee

27   formulas" because it found that, "at least for now, the incentive-fee formulas and the

28   reimbursement rates should be shielded from public view."  (Doc. 49 at 5).  The Court then

1    issued an Order that permitted the following docket numbers to remain under seal, without

2    prejudice to later move to unseal: 6, 12, 22, 24, 28, 31, 33, 34, 36, 37, 40, and 46 ( "Sealed

3    Documents").  (Doc. 66).

4          Caremark now brings a Motion for Protective Order, which seeks to retain the

5    redactions. (Doc. 67).  AHF opposes Caremark's Motion, arguing Caremark failed to carry

6    its burden of showing that information subject to the motion is a trade secret.  (Doc. 69 at

7    17).

8          The Court further stated that "[a]lthough [it] agrees with Respondent's argument

9    that unlawful business practices are not deserving of trade secret protection, it would be

10   premature at this juncture to find that the incentive-fee formula is not a trade secret because

11   the arbiter found the formulas to be unconscionable. Indeed, Petitioners initiated these

12   proceedings to challenge that very decision." (*Id.*)  The Court concluded that "a wholesale

13   seal of all documents in this case is not appropriate; nor is the wholesale seal of the Award

14   or Provider Manual.  The incentive-fee formulas should instead be redacted from the

15   record." (*Id.* at 7).

16         Thus, the only outstanding issue is whether the Sealed Documents, which

17   presumably contain descriptions of incentive fee formulas, should remain sealed.[9]

18   Caremark argues the Court should maintain redactions to the reimbursement information,

19   including the point-of-sale rates, network variable-fee rates, and dispensing fees that

20   participating pharmacies receive in Caremark's Medicare Part D networks.  (Doc. 67 at 6–

21   10).  AHF contends Caremark already publicly disclosed the variable-fee rates in *Senderra*,

22   another matter pending in this district.  *Senderra Rx Partners, LLC v. CVS Health Corp.*,

23   No. 2:19–cv–05816–SPL (D. Ariz.).

24         The Court will apply the same standards to Caremark's most recent request as it did

25

26   [9] Although Caremark also seeks to maintain redactions to (i) information contained in a
     Specialty Drug Reimbursement Addendum and (ii) information concerning a separate
27   arbitration proceeding between Caremark and AHF (Doc. 67 at 2), the Court finds
     Caremark failed to show how these documents are related to the incentive fee formulas.
28   Caremark also fails to explain how these documents are not already covered by the Court's
     previous Order, which found no cause existed to seal or redact anything but those
     documents describing the incentive fee formulas.  (Doc. 49).

1    to its initial Motion to Seal.  Accordingly, the Court begins with a "strong presumption in
2    favor of [public] access."  *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th
3    Cir. 2006); *see also Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) (The public
4    has a general right of access "to inspect and copy . . . judicial records and documents").
5    "[A] party seeking to seal a judicial record then bears the burden of overcoming this strong
6    presumption.'"  *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1095 (9th Cir.
7    2016) (quoting *Kamakana*, 447 F.3d at 1178)).  To meet its burden, a party seeking to file
8    a document under seal must give compelling reasons supported by specific factual findings.
9    *Id.*  The moving party must specifically identify "where in the documents confidential
10   financial information and trade secrets are to be found."  *Foltz v. State Farm Mut. Auto.
11   Ins. Co.*, 331 F.3d 1122, 1137 (9th Cir. 2003).  General allegations of confidentiality,
12   "without further elaboration or any specific linkage with the documents," do not satisfy the
13   moving party's burden.  *Kamakana*, 447 F.3d at 1184.

14          Caremark argues that although the *Senderra* court ordered the reimbursement-
15   related information to be filed on the public docket, this does not mean that the information
16   is no longer protectable.  (Doc. 67 at 8).  Specifically, Caremark argues trade secrets
17   disclosed in prior court proceedings do not lose protection in subsequent proceedings.  (*Id.*)
18   As an initial matter, the Court notes the cases cited by Caremark to support this proposition
19   are not binding on this Court because those cases are outside this Circuit.[10]  Second, as to
20   the variable-fee rates, the Court finds the reasoning from the *Senderra* court instructive.
21   There, the court found Caremark failed to meet their burden of showing that the use of a
22   variable-fee rebate was a trade secret because of a public article indicating variable fees
23   and network rebates "are common with regards to pharmacy DIR fees" and its explicit
24   mention "that CVS uses them."  *Senderra Rx Partners, LLC*, No. 2:19–cv–05816–SPL (D.
25   Ariz.).  Because of this, the court found it "cannot conclude that [Caremark] receive[s] a

---

26   [10] *See Hoeschst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 418 (4th Cir. 1999);
27   *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 848–49 (10thCir. 1993);
     *Kittrich Corp. v. Chilewich Sultan LLC*, 2013 WL 12131376, at *4 (C.D. Cal. Feb. 20,
     2013); *MicroStrategy Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 418 (E.D. Va.
28   2004); *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231,
     1254–55 (N.D. Cal. 1995).

competitive advantage from the secret or proprietary nature of a variable network rebate . . . [and therefore] will not redact this information from the record." *Id.* Finally, as to the point-of-sale rates and the dispensing fees, Caremark fails to "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure . . . ." *Kamakana*, 447 F.3d at 1178-79. Nor has Caremark met its burden of showing that disclosure of those fees, which the arbitrator found substantively unconscionable, will work "a clearly defined and serious injury" to them. *Oliner v. Kontrabecki*, 745 F.3d 1024, 1026 (9th Cir. 2014). For these reasons, the Court will deny Caremark's Motion for Protective Order, and direct the Clerk of the Court to unseal the entire case.

Accordingly,

**IT IS ORDERED** that Petitioner Caremark, L.L.C. and Caremark PCS, L.L.C's Motion to Vacate or Correct the Arbitration Award (Doc. 12) is **denied** and Respondent AIDS Healthcare Foundation's Motion to Confirm Award and Enter Judgment (Doc. 72) is **granted**. The Final Award of the Arbitration Panel, dated November 12, 2021, is confirmed by the Court pursuant to § 9 of the Federal Arbitration Act, 9 U.S.C. § 9.

**IT IS FURTHER ORDERED** that Respondent AIDS Healthcare Foundation is awarded its reasonable attorneys' fees and costs it incurred in seeking the confirmation of the final arbitration award in the sum of $114,333.09.

**IT IS ORDERED** that Petitioner Caremark, L.L.C. and Caremark PCS, L.L.C.'s Motion for Protective Order to Maintain Redactions to Documents Filed in Accordance with May 5, 2022, Order (Doc. 67) is **denied**. Accordingly, the Clerk of the Court is directed to unseal all filings in this case.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter a judgment in favor of Respondent AIDS Healthcare Foundation confirming the Final Award of the Arbitration Panel, dated November 12, 2021. (Doc. 12-9 at 14–75).

**IT IS FURTHER ORDERED** that AHF is awarded attorneys' fees and costs in the sum of $114,333.09, plus pre-judgment interest computed on the total amount of

$23,113,158.57 at the annual rate of 5.75% and at a daily rate of $3,641.11 running from November 12, 2021, to the date of entry of this Judgment, plus post-judgment interest on the foregoing sums at the rate of 2.92% until paid in full.

**IT IS FINALLY ORDERED** that this action is hereby terminated.

Dated this 14th day of September, 2022.

Honorable Diane J. Humetewa
United States District Judge